IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GREGORY HACKMAN d/b/a GREGORY )
HACKMAN RELATORS, and GREGORY )
HACKMAN REALTORS, INC., an Illinois )
corporation )
                                   )      No. 06 C 50240
          Plaintiffs, )
                                   )
     v. )
                                   )
DICKERSON REALTORS, INC., an )
Illinois corporation d/b/a )
DICKERSON-NEIMAN REALTORS, )
WHITEHEAD, INC., an Illinois )
corporation d/b/a WHITEHEAD )
REALTORS, PREMIER REAL ESTATE )
BROKERAGE SERVICES, INC., an )
Illinois corporation d/b/a COLDWELL )
BANKER PREMIER, CENTURY 21 COUNTRY )
NORTH, INC., an Illinois corporation )
d/b/a CENTURY 21 COUNTRY NORTH, R. )
CROSBY, INCORPORATED, an Illinois )
corporation d/b/a PRUDENTIAL CROSBY )
REALTORS, McKISKI-LEWIS, INC., an )
Illinois corporation d/b/a TOM )
McKISKI REALTORS, LORI REAVIS, RAY )
YOUNG, MICHAEL DUNN, DONNA SHIPLER )
n/k/a DONNA KITZMAN, MELISSA SMITH, )
JESSICA LICARY, DIANE PARVIN, )
ROCKFORD ASSOCIATION OF REALTORS, )
and ILLINOIS ASSOCIATION OF )
REALTORS, )
                                   )
          Defendants. )
                                   )

## MEMORANDUM OPINION AND ORDER

     Plaintiffs Gregory Hackman d/b/a Gregory Hackman Realtors and

Gregory Hackman Realtors, Inc. (collectively "Hackman")[1] have

---

[1]Hackman alleges that Gregory Hackman is an individual person
who did business as Gregory Hackman Realtors and Gregory Hackman

brought this multi-count complaint against several defendants, generally alleging that these defendants who, like Hackman, are all involved in the real estate market in Rockford, Illinois, collectively shut Hackman out of the Rockford real estate market to retaliate against him for charging a lower commission rate than other realtors. Some of these defendants have answered Hackman's complaint, while others have brought motions to dismiss various counts of the complaint or for a more definite statement of certain counts. Defendants Diane Parvin ("Parvin") and Century 21 Country North, Inc. ("Century 21") have also brought motions to compel arbitration and stay the present proceedings.[2]  These motions are resolved as discussed below.

I.

Hackman's complaint alleges that from 1991 to 2005, Gregory Hackman, a natural person, was the sole proprietor of Gregory Hackman Realtors. (Compl. ¶ 5.)  Since late 2005, Gregory Hackman has been the president and owner of Gregory Hackman Realtors, Inc. (*Id.*)  Other defendants are residential realtor businesses or individual licensed real estate agents. (*Id.* at ¶¶ 6-18.)  In addition, defendant Illinois Association of Relators ("IAR") is an

_____

Realtors, Inc.  For ease of discussion this memorandum opinion and order refers to both plaintiffs collectively as "Hackman."

[2]Since Century 21 has since settled with Hackman and Hackman has voluntarily dismissed it from this litigation, I do not consider its motion to compel arbitration; that motion is denied as moot.

organization headquartered in Springfield, Illinois, that "serves as the governing body to enforce the regulations in the code of ethics promulgated by the National Association of Realtors," "serves to resolve disputes between licensed Realtors over alleged violations of the NAR regulations," and, "in proper circumstances, accepts the transfer of local disputes and disciplinary actions." (*Id.* at ¶ 20.) Similarly, defendant Rockford Association of Realtors ("RAAR") is an organization headquartered in Rockford, Illinois, that, in addition to engaging in education and other programs related to the real estate industry, "enforces the regulations in the code of ethics promulgated by the National Association of Realtors, and serves to resolve disputes between licensed Realtors over alleged violations of the NAR regulations." (*Id.* at ¶ 19.)

Hackman's complaint alleges that his dispute with the defendants began in 2000, when he opened a new office and decided that he would charge a 5% brokerage fee/commission for new clients. (*Id.* at ¶ 21.) This figure is significant because the Multiple Listings Service ("MLS") rules require the selling agent to share the commission equally with the buyer's agent so that other brokers in the Rockford area acting as buyer's agents in transactions in which Hackman was the seller would receive a commission lower than the normal commission of 6 to 7%. (*Id.* at ¶¶ 23-24.) For this reason, Hackman alleges, defendants Dickerson Realtors, Inc.

("Dickerson"), Whitehead, Inc. ("Whitehead"), Century 21, Premier Real Estate Brokerage Services, Inc., d/b/a Coldwell Banker Premier ("Coldwell"), R. Crosby, Inc. d/b/a Prudential Crosby Realtors ("Prudential"), and McKiski-Lewis, Inc. ("McKiski") entered into an agreement to "retaliate against [Hackman] in every facet of his business." (*Id.* at ¶ 25.) Hackman alleges that their retaliatory actions included refusing to present offers on their own listings from potential purchasers represented by Hackman, and disparaging Hackman to discourage their seller clients from accepting offers from his purchasing clients. (*Id.*) He further alleges that Dickerson ordered all but one of its offices not to allow Hackman agents to set up showings of Dickerson-listed properties (*Id.* at ¶ 27), and that Coldwell and Dickerson filed false ethics complaints against him. (*Id.* at ¶ 30.) Hackman alleges that these activities caused him lost sales commissions and smeared his reputation, resulting in lost past business and future prospects. (*Id.* at ¶ 36.) Hackman's claims include claims against Dickerson, Whitehead, Century 21, Coldwell, Prudential, McKiski and RAAR for violation of the Sherman Act, 15 U.S.C. § 1 & 2 and the Illinois Antitrust Act, 740 ILL. COMP. STAT. 10/1, *et seq.* (Counts I and II); a claim for a temporary injunction against RAAR and IAR to prevent them from conducting an ethics hearing originally scheduled for December 5,

2006 (Count III);[3] a request for a declaration of rights and a permanent injunction against RAAR and IAR concerning the same ethics hearing (Count IV); a claim for defamation against Dickerson, Lori Reavis ("Reavis"), Ray Young ("Young"), Prudential, Jessica Licary ("Licary"), Whitehead, Coldwell, Century 21 and McKiski (Count V); and a claim for tortious interference with business expectancy against Dickerson, Michael Dunn ("Dunn"), Reavis, Melissa Smith ("Smith"), Young, Whitehead, Coldwell, Donna Shipler ("Shipler"), Prudential, Licary, Century 21, Parvin and McKiski (Count VI).

## II. Parvin's Motion to Compel Arbitration

I first address Parvin's motion to compel arbitration under the FAA. Parvin contends that Hackman's claim against her for tortious interference with contract, Count VI of his complaint, is subject to an enforceable arbitration agreement Hackman made as a member of RAAR. While not denying that his membership in RAAR included an agreement to arbitrate, Hackman contends that Count VI is not subject to the arbitration agreement.

In her original motion for arbitration Parvin contended that I should order arbitration under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA") (2007). However, after I ordered

---

[3]Plaintiffs submitted a petition for a temporary restraining order on November 30, 2006, the same day that they filed the present complaint. However, on December 1, 2006, plaintiffs withdrew that petition, and it has not since been renewed.

supplemental briefing on certain issues related to her motion, Parvin changed her position and now asserts that arbitration was mandated by the Illinois Arbitration Act.  The FAA only applies to contracts that "evidenc[e] a transaction involving commerce."  9 U.S.C. § 2.  The Supreme Court has interpreted the term "involving commerce" as "the functional equivalent of the more familiar term 'affecting commerce'-words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) (citing *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265,  273-74 (1995)).

In *Cecala v. Moore*, 982 F. Supp. 609 (N.D. Ill. 1997), the district court concluded that because the arbitration agreement at issue was part of a contract between two Illinois parties entered into in Illinois, and because the contract concerned a local real estate transaction, it did not implicate interstate commerce and therefore did not trigger the FAA.  *Id.* at 611-12.  Relying on *Cecala*, Parvin contends that because Count VI concerns a single real estate transaction between local parties, it does not implicate interstate commerce and therefore does not trigger the FAA.  I disagree.  Count VI of Hackman's complaint contains an allegation that Parvin, an agent of Century 21, violated the MLS agreement with Hackman and interfered with his business expectancy with a client by falsely telling Hackman that a property was not

available for his client to see. The nature of the dispute is not the relevant question for purposes of the FAA, however, but rather the nature of the contract requiring arbitration. *See* 9 U.S.C. § 2. The arbitration agreement that Parvin wishes to invoke is contained in the bylaws of the RAAR, to which Hackman and Parvin both belong.

While neither party has presented much information concerning the RAAR and its bylaws, it appears that RAAR is a local Illinois real estate association. A local real estate association formed by realtors who participate in real estate transactions, even if local, does "affect commerce" under the meaning of the Commerce Clause. The Supreme Court has previously suggested that the activities of real estate brokers affect interstate commerce because the financing of real estate purchases involves multi-state lending institutions, mortgages are insured under federal programs involving interstate transfers of premiums and settlements, mortgage obligations are traded as financial instruments in an interstate secondary mortgage market, and required title insurance is furnished by interstate corporations. *See McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 245 (1980) (finding a sufficient basis for petitioners to proceed to trial on claim that defendant real estate brokers had violated Sherman Act by engaging in price-fixing of brokerage commissions on sale of residential property). Other courts have also concluded that businesses

"engaged in real estate markets" have at least a minimal effect in interstate commerce. *See United States v. Leslie*, 103 F.3d 1093, 1102 (2d Cir. 1997). Therefore, I conclude that the bylaws of the RAAR do affect commerce under the meaning of the Commerce Clause, and therefore are subject to the provisions of the FAA.

Applying the requirements of the FAA, I must determine whether Hackman had a duty to arbitrate his claims against Parvin. Under the FAA, a party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. "[I]f the parties have an arbitration agreement and the asserted claims are within its scope," the district court must grant the motion to compel arbitration. *Sharif v. Wellness Int'l Network, Ltd.*, 376 F.3d 720, 726 (7th Cir. 2004) (citing *Kiefer Speciality Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909 (7th Cir. 1999)). I must grant Parvin's request to arbitrate "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Kiefer*, 174 F.3d at 909 (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)).

Whether a particular issue is subject to arbitration is a matter of contract interpretation. *Kiefer*, 174 F.3d at 909 (citation omitted). I must rely on state contract law governing

the formation of contracts. *James v. McDonald's Corp.*, 417 F.3d 672, 677 (7th Cir. 2005) (citing *First Options of Chicago Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). The parties contend that Illinois law should apply to interpret this contract, since all the parties to this case are residents of Illinois and the RAAR was entered into in Illinois. No matter the provenance of the other documents referred to in the relevant sections of the RAAR bylaws, including the "Code of Ethics and Arbitration Manual," because they are incorporated by reference into the RAAR bylaws I must also interpret them as part of this contract under Illinois law. *See T.H.E. Ins. Co. v. Chicago Fireworks Mfg. Co.*, 311 Ill. App. 3d 73, 78, 243 Ill. Dec. 879, 884, 724 N.E.2d 188, 193 (Ill. App. Ct. 1999).[4]

Interpreting the meaning of the RAAR bylaws and the incorporated documents (collectively the "contract") under Illinois law, I must first determine whether the language of the contract is ambiguous. *See Quake Const., Inc. v. American Airlines, Inc.*, 141 Ill.2d 281, 288, 152 Ill. Dec. 308, 312, 565 N.E.2d 990, 994 (1990) (citations omitted). If the language is not ambiguous I may determine the meaning of the contract solely from the writing itself. *Id.* If the terms of the contract are ambiguous or capable

_____

[4]The parties have not presented a complete copy of the Code of Ethics, but the portions I have reviewed do not show that the Code of Ethics has any choice of law provision or any other indication that the law of another state applies to interpret its requirements.

9

of more than one interpretation, then I may examine parol evidence to ascertain the parties' intent. *See id.*

Here, the unambiguous language of the RAAR bylaws is clear that the parties have agreed to arbitrate; the parties do not dispute the existence of such an agreement. Section 2 of Article VII of the RAAR's bylaws provides:

> It shall be the duty and responsibility of every REALTOR® Member of this Association to . . . arbitrate controversies arising out of real estate transactions as specified by Article 17 of the Code of Ethics [of the NATIONAL ASSOCIATION OF REALTORS®], and as further defined and in accordance with the procedures set forth in the *Code of Ethics and Arbitration Manual* of this Association as from time to time amended.

(Parvin Mot. to Compel Arbitration Ex. A at 1.) Article 17 of the National Association of Realtors ("NAR") Code of Ethics ("Code of Ethics") provides:

> In the event of contractual disputes or specific non-contractual disputes as defined in Standard of Practice 17-4 between REALTORS® (principals) associated with different firms, arising out of their relationship as REALTORS®, the REALTORS® shall submit the dispute to arbitration in accordance with the regulations of their Board or Boards rather than litigate the matter.

(Parvin Mot. to Compel Arbitration Ex. B, Art. 17.) These provisions make clear that the parties have agreed to arbitrate controversies as specified by the Code of Ethics and as further defined and in accordance with procedures in the "Code of Ethics and Arbitration Manual."

Second, I must determine whether the claims Hackman asserts against Parvin in Count VI are within the scope of the arbitration agreement. *Sharif*, 376 F.3d at 726 (citation omitted). The unambiguous language of the Code of Ethics as incorporated into the RAAR bylaws is that the parties agreed to submit to arbitration "contractual disputes" and certain non-contractual disputes between realtors arising out of their relationship as realtors. None of the parties assert that any of the specific non-contractual disputes identified in the NAR Standards of Practice apply to Hackman's claims, and by the plain language of the Standards of Practice they do not, so I must only determine whether Hackman's claims against Parvin are "contractual disputes" under the meaning of Article 17. The plain language of the contract does not define "contractual dispute," and this term is ambiguous. One plausible interpretation is that the term refers to a dispute between realtors about a contract between those realtors. Another potential interpretation is that it refers to a dispute between realtors about a contract between one of the realtors and a third party.

The RAAR bylaws indicate that the duty to arbitrate is limited and defined by the procedures set forth in the "Code of Ethics and Arbitration Manual." Parvin presents a section of that document entitled "Suggested Factors for Consideration by a Hearing Panel in Arbitration" (attached as Exhibit A to her supplemental reply) that

she contends defines "contractual dispute" as referring to one of four types of contracts.[5]  The "Suggested Factors" document to which Parvin refers lists four types of contracts that "come into play" in real estate transactions:  (1) the listing contract between the seller and the listing broker; (2) the contract between the listing broker and cooperating brokers; (3) the purchase contract between the seller and the buyer; and (4) a buyer-broker agreement between the purchaser and a broker.  (Def.'s Supp. Reply Ex. A at 2-3.)  It then explains that there are "hazards in formation and afterward" to each of these contracts, certain difficulties may be arise, and states that "[t]here are several methods by which contractual questions (or 'issues' or 'disputes') are resolved," including arbitration.  (*Id.* at 4.)  Finally, the "Suggested Factors" document states:

> Boards and Associations of REALTORS® provide arbitration to resolve contractual issues and questions . . . that arise between members, between members and their clients, and, in some cases, between parties to a transaction brought about through the efforts of REALTORS®.  Disputes arising out of any of the four above-referenced contractual relationships may be arbitrated. . . .

(*Id.*)  This language does not allow the conclusion that the term "contractual dispute" in Article 17 could refer to a dispute

_____

[5]In his supplemental response Hackman does not dispute that the document to which Parvin refers is part of the document referenced in the RAAR bylaws, and is therefore incorporated as part of the contract I must interpret.

between realtors relating to a contract between one of those realtors and a third party; this document only contemplates disputes between parties to a contract about that contract. Because this language makes the contract unambiguous, I need not consider any parol evidence.

Based on this interpretation of the arbitration agreement, I need determine whether Count VI is a claim against Parvin concerning a dispute about a contract between her and Hackman. In Count VI Hackman brings what he identifies as a tortious interference with business expectancy claim against Parvin and other defendants. In that count his only specific allegations against Parvin are:

> On August 10, 2006, PARVIN, an agent of CENTURY 21, misrepresented the status of a property (saying it was unavailable) in order to prevent HACKMAN from presenting an offer. The MLS computer system did not reflect that the property was unavailable. The sellers previously confirmed availability of the property with HACKMAN'S clients directly. PARVIN's actions violated MLS rules, and, although HACKMAN was eventually able to present the offer, PARVIN's actions resulted in HACKMAN's clients not making the purchase.

(Compl. at ¶ 91.) Hackman also generally alleges that he "had valid business relationships, and the expectancy of the completion of those relationships" with clients and that defendants "intentionally interfered with said business relationships by ingratiating themselves with said clients, and making derogatory

statements about HACKMAN until the client left HACKMAN and went to the Defendants' offices."  (*Id.* at ¶¶ 91, 96.)

Hackman contends that Count VI is a tort claim and as such is not a contractual dispute subject to arbitration.  Parvin responds that although Count VI is a self-described tort claim, it is really a contract claim between Hackman and Parvin for a violation of the rules of the Multiple Listing Service, which is connected to the parties' agreement as members of RAAR.  I agree that, to the extent Hackman is bringing a claim against Parvin for a violation of the MLS rules, such a claim is governed by the arbitration agreement. Article XVIII of the RAAR bylaws provides that the RAAR shall maintain the MLS for the use of its members, and that the MLS is governed by the RAAR bylaws.  (Parvin Mot. to Compel Arbitration Ex. A at 1.)  No matter how Hackman defines his own claim, disputes between realtors concerning violations of the MLS rules are "contractual disputes" under Article XVII.  Therefore, they are subject to arbitration.

However, Hackman's general allegations in paragraphs 91 and 96 of his complaint that defendants, including Parvin, interfered with his valid business relationships with potential clients by making derogatory statements about Hackman is not a claim concerning a contract between Hackman and defendants, but a tort claim that defendants intentionally interfered with Hackman's prospective economic advantage.  *See, e.g.*, *Fellhauer v. City of Geneva*, 142

Ill.2d 495, 512, 154 Ill. Dec. 649, 656-57, 568 N.E.2d 870, 877-78 (1991) (citations omitted). This claim in no way falls under the arbitration agreement. Because it can be said with "positive assurance" that the parties' arbitration agreement is "not susceptible of an interpretation that covers" this aspect of Count VI, it is not subject to arbitration. *See Kiefer*, 174 F.3d at 909 (citation omitted).[6]

Given that I find that one aspect of Hackman's claims against Parvin is subject to arbitration, but that I find other of his claims in this litigation are not, it is within my discretion to decide whether to stay the whole of the litigation or to allow the remainder of Hackman's claims to proceed. *Volkswagen of Am., Inc. v. SUD's of Peoria, Inc.*, 474 F.3d 966, 970-72 (7th Cir. 2007) (citations omitted). The Seventh Circuit has explained that where one claim is arbitrable, the remaining claims should be stayed as well where the arbitration may shed light on remaining issues, or where allowing both the arbitration and the case to proceed simultaneously runs the risk of inconsistent verdicts. *Id.* at 972 (citing *Morrie Mages & Shirlee Mages Found. v. Thrifty Corp.*, 916 F.2d 402 (7th Cir. 1996); *AgGrow Oils, L.L.C. v. Nat'l Union Fire*

---

[6]As noted below in section IV.C. *supra*, I do not believe that Hackman has stated a claim with respect to these general allegations under the pleading standard articulated in *Bell Atlantic*. However, to the extent Hackman may later state those claims with the specificity required under the standard, they do not appear to be within the scope of the arbitration agreement.

*Ins. Co. of Pittsburgh*, 242 F.3d 777 (8th Cir. 2001)).  Here, the arbitrable claim, whether Parvin violated the MLS rules by misrepresenting the status of a property, is tangentially related to Hackman's allegations under the Sherman Act that defendants agreed to boycott Hackman, although this specific allegation is not a part of the Sherman Act claim and Parvin herself is not a defendant to that claim.  Hackman's claim against Parvin for violating the MLS rules and tortiously interfering with his business expectancy is a discrete claim that involves no other parties, particularly since Century 21 is now dismissed from this litigation.  Further, staying the entire matter would cause the "tail to wag the dog" and would not aid in the most effective resolution of the claims in this case.  *See Volkswagen of Am.*, 474 F.3d at 971 (citing *Pryner v. Tractor Supply Co.*, 109 F.3d 354, 361 (7th Cir. 1997)).  For this reason, I grant Parvin's motion to compel arbitration of Hackman's claim concerning Parvin's purported violation of the MLS rules, but deny Parvin's motion to stay this proceeding.  I deny Century 21's motion to compel arbitration as moot.  In all other respects, Parvin's motion to compel arbitration is denied.

### III. IAR and RAAR's Motion to Dismiss

IAR and RAAR have brought a joint motion under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss Counts I, II, III and IV of Hackman's complaint.  They argue that I should

dismiss Counts I and II against RAAR for failure to state a claim, and that I should dismiss the claims against IAR and RAAR in Counts III and IV because they do not state a claim and because I lack supplemental jurisdiction under 28 U.S.C. § 1367(a). For the following reasons I grant RAAR and IAR's motion to dismiss Counts I and II for failure to state a claim, and consequently also dismiss Counts III and IV for lack of subject matter jurisdiction.

In resolving IAR and RAAR's motion to dismiss, I must accept all well-pled facts in Hackman's complaint as true. *Thompson v. Illinois Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002).[7] I must view the allegations in the light most favorable to Hackman. *Gomez v. Illinois State Bd. of Educ.*, 811 F.2d 1030, 1039 (7th Cir. 1987). Dismissal of a claim is proper if Hackman has not, at minimum, made enough factual allegations to raise a right to relief above a "speculative level." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007) (citations omitted). In addition to the allegations contained in Hackman's complaint, I may consider the attachments to the complaint. *See* FED. R. CIV. P. 10(c); *Help at Home, Inc. v. Med. Capital, LLC*, 260 F.3d 748, 752 (7th Cir.

---

[7]In *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942 (7th Cir. 2003), the Seventh Circuit explained that where subject matter jurisdiction is not evident on the face of the complaint, a motion to dismiss under Rule 12(b)(1) is analyzed "as any other motion to dismiss, by assuming for purposes of the motion that the allegations in the complaint are true." *Id.* at 946 (citations omitted).

2001) (citation omitted).  Normally, if a district court, in ruling on a motion to dismiss, considers documents not incorporated into the complaint, the district court must convert the motion to dismiss to a motion for summary judgment under Federal Rule of Civil Procedure 56.  FED. R. CIV. P. 12(b); *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002).  However, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [his] claim."  *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993).

## A.  Count I

Count I of Hackman's complaint is a claim against RAAR and other defendants for violation of the Sherman Act, 15 U.S.C. §§ 1 & 2.  Defendants contend that I should dismiss this claim because the Sherman Act does not apply to non-profit corporations lacking commercial objectives.  They further argue that Hackman has failed to plead that RAAR engaged in competitive conduct, possessed monopoly power, did more than "encourage" anticompetitive activity, or that RAAR's purported conduct had an effect on interstate commerce.  Because I find that Hackman has not properly alleged RAAR agreed with any other defendant to engage in anticompetitive activity, I grant RAAR and IAR's motion to dismiss this claim.

"A successful claim under Section 1 of the Sherman Act requires proof of three elements: (1) a contract, combination, or

conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury." *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993) (citations omitted). A jurisdictional prerequisite to such a claim is that the defendants' activities affect interstate commerce; a plaintiff may conclusorily allege an effect on interstate commerce. *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 778-80 (7th Cir. 1994). To prove his claim that defendants conspired to monopolize the market Hackman must show

> 1) the existence of a combination or conspiracy, 2) overt acts in furtherance of the conspiracy, 3) an effect upon a substantial amount of interstate commerce and 4) the existence of specific intent to monopolize.

*Great Escape, Inc. v. Union City Body Co., Inc.*, 791 F.2d 532, 540-41 (7th Cir. 1986) (citations omitted).

Hackman's claims against RAAR are not barred by RAAR's non-profit status. There is no bar to bringing Sherman Act claims against non-profit corporations where those corporations have engaged in anticompetitive activity. *See, e.g.*, *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 100 n.22 (1984) (citations omitted); *United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1285 (7th Cir. 1990). Hackman alleges that RAAR "provides and promotes programs, products and services to enhance licensed Realtors' ability to conduct their individual businesses successfully, and that RAAR encouraged other defendants

to boycott him.  Setting aside whether encouragement is enough to qualify as anticompetitive activity under the Sherman Act, Hackman has sufficiently alleged that RAAR engaged in anticompetitive activity such that its non-profit status is irrelevant.

Second, RAAR and IAR contend that Hackman has failed to plead various requirements to establish his Sherman Act claims, including that RAAR engaged in competitive conduct, possessed monopoly power, or did more than encourage other defendants' anticompetitive activity.  They argue that although Hackman alleges that the other defendants conspired to exclude Hackman from the market, there is no evidence that RAAR agreed to any conspiracy or did anything more than encourage the other defendants.  Hackman's only allegation against RAAR in Count I is that, with RAAR's encouragement, other defendants "engaged in unfair anticompetitive behavior by agreeing to boycott HACKMAN, by refusing to offer the same commission as all other MLS members, and refusing to allow HACKMAN to show properties listed by the defendants."  (*Id.* at ¶ 43.)  Hackman contends that defendants' collective actions "intentionally constitute an illegal conspiracy to conduct a group boycott of HACKMAN by the holders of a large share of the Rockford area real estate market."  (*Id.* at ¶ 45.)  Hackman also alleges that the other defendants, "through their market share and influence within the RAAR" have the power to control commission rates and to exclude any realtor who attempts to charge a lower commission rate.  (*Id.* at ¶ 42.)  Count I's only

specific allegation about RAAR's participation in the purported conspiracy is that RAAR encouraged other defendants to boycott Hackman, and that RAAR contributed to the defendants' ability to monopolize the market.

As defendants contend, other courts have concluded that a defendant must do more than "encourage" other defendants in order to be liable under the Sherman Act. *See, e.g.*, *Nichols Motorcycle Supply, Inc. v. Dunlop Tire Corp.*, 913 F. Supp. 1088, 1120 (N.D. Ill. 1995), *vacated on other grounds by* No. 95-C-617, Order at 1 (Sept. 18, 1995) ("A defendant's actions become illegal only when its concerns and plans cross the line between encouragement and agreement."); *AD/SAT v. Assoc. Press*, 181 F.3d 216, 242-43 (2d Cir. 1999) (holding that although a trade association may have encouraged, assisted, and endorsed the development of a competitor's product, there was no evidence that the association agreed to boycott the plaintiff's product or participated in a refusal to deal with the plaintiff). The Supreme Court recently emphasized in *Bell Atlantic* that to survive a motion to dismiss a § 1 Sherman Act claim a plaintiff's complaint must include "enough factual matter (taken as true) to suggest than an agreement was made." 127 S. Ct. at 1966. Encouragement absent an agreement is not enough. Here, Hackman has not met this standard. He has not alleged that RAAR reached an agreement with other defendants, and has not alleged facts from which it could be inferred that RAAR

reached an agreement. The same is true under § 2 of the Sherman Act; Hackman has not sufficiently alleged that RAAR agreed or conspired with other defendants to monopolize the market, only that other defendants used their position in RAAR to obtain a monopoly. Therefore, I need not consider IAR and RAAR's other arguments concerning Count I, and I grant their motion to dismiss Count I against RAAR.

## B. Count II

Count II of Hackman's complaint is a claim against RAAR and other defendants for violation of the Illinois Antitrust Act, 740 ILL. COMP. STAT. 10/1, *et seq.* Count II tracks the allegations of Count I, that defendants Dickerson, Whitehead, Century 21, Coldwell, Prudential and McKiski, at RAAR's encouragement, boycotted Hackman in violation of Section 3(2) of Illinois act.[8] RAAR and IAR argue that Hackman has no claims against RAAR under the Illinois Antitrust Act because that act does not apply to nonprofit corporations, and because the complaint does not properly allege the existence of a conspiracy or that RAAR reached any agreement or engaged in any anticompetitive conduct. I agree and grant RAAR and IAR's motion to dismiss Count II.

_____

[8]Count II also alleges that Dickerson, Whitehead, Coldwell, Century 21, Prudential and McKiski violated Section 3(3) of the Illinois act, but I need not consider this allegation since Hackman has not brought it against RAAR.

First, RAAR and IAR argue that the Illinois Antitrust Act does not apply to nonprofit corporations. In *Int'l Test and Balance, Inc. v. Assoc. Air and Balance Council*, No. 98 C 2553, 1998 WL 957332 (N.D. Ill. Dec. 23, 1998), the district court dismissed a claim against the defendant because it was a non-profit corporation, and specifically held that nonprofit corporations are exempt from claims under the Illinois Antitrust Act. *Id.* at *8 (citing *O'Regan v. Arbitration Forums, Inc.*, 121 F.3d 1060, 1065 (7th Cir. 1997)). In *O'Regan*, the Seventh Circuit affirmed the dismissal of Illinois Antitrust Act claims against a defendant nonprofit corporation. It noted that under 740 ILL COMP. STAT. ANN. § 10/4, the act only covers services "performed in whole or in part for the purposes of financial gain" and under § 10/2 is only intended to prohibit restraints of trade relating to for-profit enterprises. *Id.* at 1066. It therefore concluded that the defendant was "a non-profit corporation, not covered by the Illinois Antitrust Act." *Id.* The Seventh Circuit did not hold that all non-profit entities are categorically excluded from the provisions of the act.

I agree with Hackman that the holdings of *O'Regan* and *Int'l Test and Balance* do not prevent Hackman from bringing an Illinois Antitrust Act claim against RAAR in this case. Section 3(2) of the Illinois Antitrust Act provides that a person violates the Illinois act through a "contract, combination, or conspiracy with one or

more other persons" that unreasonably restrains trade or commerce, 740 ILL COMP. STAT. ANN. § 10/3(2); Hackman alleges that defendants violated this provision. Courts interpret the Illinois Antitrust Act in light of federal antitrust law upon which it is modeled; this section is modeled on Section 1 of the Sherman Act. *Id.* at § 10/11; *Laughlin v. Evanston Hosp.*, 133 Ill.2d 374, 383-84, 140 Ill. Dec. 861, 865, 550 N.E.2d 986, 990 (1990). Given that under federal antitrust law claims may be brought against non-profits that engage in anticompetitive activity, there is no basis to conclude that the same is not true under Section 3(2).

However, like Hackman's claims under the Sherman Act, his claims under the Illinois Antitrust Act fail for other reasons. The Illinois Supreme Court has applied Sherman Act precedent to conclude that to state a claim under Section 3(2) of the Illinois Antitrust Act, a complaint must allege that a conspiracy existed and that it unreasonably restrained trade. *People ex rel. Scott v. Coll. Hills Corp.*, 91 Ill.2d 138, 153-54, 61 Ill. Dec. 766, 774, 435 N.E.2d 463, 470-71 (1982) (citations omitted). A conspiracy requires more than evidence of parallel conduct, but rather evidence of an agreement. *See McClure v. Owens Corning Fiberglass Corp.*, 188 Ill.2d 102, 140, 720 N.E.2d 242, 261, 241 Ill. Dec. 787, 806 (1999) (adopting Sherman Act conspiracy standard requiring evidence of more than parallel conduct to civil conspiracy claims, and noting that Illinois courts have previously applied the Sherman

Act standard to Illinois Antitrust Act claims). As discussed above in Section II.A. *supra*, an allegation of encouragement is not a sufficient allegation of fact that raises Hackman's right to relief above a speculative level. *Bell Atl.*, 127 S. Ct. at 1964. I therefore grant RAAR and IAR's motion to dismiss Count II against RAAR.

## C. Counts III and IV

Count III of Hackman's complaint is a request for a temporary injunction against RAAR and IAR to prevent them from conducting an ethics hearing against Hackman. Count IV is a request for a declaration of rights and a permanent injunction against RAAR and IAR concerning the same ethics hearing. This hearing was originally scheduled for December 5, 2006, and although Hackman originally filed a motion for a temporary injunction to prevent this hearing from taking place, he has since withdrawn that motion. IAR and RAAR's motion to dismiss these counts contends that I lack supplemental jurisdiction over these claims and that, even assuming I do have jurisdiction, Hackman's agreements with RAAR and IAR prevent him from challenging the results of any ethics hearing.

Hackman's complaint alleges jurisdiction over Counts III and IV under 28 U.S.C. § 1367(a), which grants district courts supplemental jurisdiction over claims "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States

25

Constitution." Federal courts have interpreted § 1367(a) to require that the supplemental claims involve "a common nucleus of operative facts" with the federal claims. *See, e.g.*, *Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir. 1995) (citations omitted). "A loose factual connection between the claims is generally sufficient." *Id.* Hackman alleges that his claims concerning the ethics complaint are connected to his antitrust claims because he contends that Coldwell and Dickerson filed a false ethics complaint against him as part of their anticompetitive scheme. (Compl. at ¶ 30.) However, his claims against RAAR and IAR concerning the ethics complaint do not concern whether the ethics complaint was false, but rather whether RAAR and IAR improperly handled the complaint. There is no allegation that would connect RAAR and IAR's treatment of the complaint as part of an anticompetitive scheme against Hackman, and this is underscored by the fact that I am dismissing Hackman's antitrust claims against RAAR. Counts III and IV do not have the same nucleus of operative facts as Hackman's other claims, so I dismiss them for lack of subject matter jurisdiction.

## D. Conclusion

For the above reasons, I grant RAAR and IAR's motion to dismiss Counts I and II against RAAR, and Counts III and IV against RAAR and IAR.

IV.  Prudential and Licari Motion to Dismiss

Defendants Prudential and Licari have brought their own motion to dismiss Counts I, II, V and VI against them for failure to state a claim.  I deny their motion as to Count V, but otherwise grant it.

A.  Counts I and II

As discussed above with respect to RAAR and IAR's motion, Hackman alleges that certain defendants, including Prudential, violated the Sherman Act by boycotting Hackman, refusing to offer the same commission as other MLS members, and refusing to allow Hackman to show properties listed by defendants.  (Compl. at ¶ 43.) Hackman brings his claim under § 1 (illegal restraint of trade) and § 2 (monopolization).  Prudential and Licary argue that this claim is deficient because it does not allege damages caused by an antitrust injury, does not allege that defendants engaged in interstate commerce, does not establish that the complaint was filed within the applicable statute of limitations, and provides no facts supporting a conspiracy or the existence of a monopoly.

First, and most importantly, Prudential and Licary contend that Hackman has failed to allege facts suggesting the existence of a monopoly or a conspiracy.  Hackman's complaint does allege that certain defendants entered into an agreement to retaliate against Hackman for undercutting the going commission rate, and he provides some specific allegations about retaliatory actions that certain

defendants (not including Prudential) took against him as a result, including a "sustained and coordinated process" of defamation by Dickerson, Whitehead, Century 21 and Coldwell. He makes a specific allegation that on a certain date Dunn ordered nearly all Dickerson offices to boycott Hackman's agents. In *Bell Atlantic* the Supreme Court clearly held that, contrary to the old pleading standard recognized in *Conley v. Gibson*, 355 U.S. 41,(1957), and followed by numerous federal courts thereafter, federal pleading requires more than just a short and plain statement of the facts. 127 S. Ct. at 1969 ("The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."). In the antitrust context, the holding of *Bell Atlantic* requires that an antitrust plaintiff pleading the existence of a conspiracy or agreement to monopolize or restrain trade do more than conclusorily plead the existence of an agreement or conspiracy, but rather "a complaint with enough factual matter (taken as true) to suggest that an agreement was made." 127 S. Ct. at 1965.[9] As discussed above, in Section II.A. *supra*, an "allegation of parallel conduct

---

[9]Although *Bell Atlantic* addresses a case in which claims were brought only under § 1 (restraint of trade) of the Sherman Act, its reasoning applies equally to claims brought under § 2 (monopolization) where the plaintiff alleges that the defendants had a monopoly through combination or conspiracy with one another, as Hackman alleges here.

and a bare assertion of conspiracy" is not enough because parallel conduct does not suggest conspiracy, and a "conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Id.* at 1966.

Hackman's complaint is in the realm of insufficiency identified in *Bell Atlantic* because he conclusorily alleges an agreement, at an unspecified time, between certain defendants to boycott him, but presents no evidence of an agreement other than evidence of parallel conduct (defendants' refusal to do business with him and the defamatory comments some defendants allegedly made about him) as well as allegations that would create a motivation for defendants to boycott him (he was undercutting them on commissions and lowering their bottom line). These facts are not enough to adequately allege that defendants had an agreement to unreasonably restrain trade under § 1 or conspired to monopolize the market under § 2. Therefore, I agree with Licary and Prudential that on this basis Hackman's complaint must be dismissed.

For the same reasons, the complaints against Licary and Prudential in Count II are dismissed. As discussed above, complaints under the Illinois Antitrust Act require factual allegations that an agreement was made. Since the pleading requirements of the Sherman Act inform the pleading requirements under the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/11;

*Laughlin*, 133 Ill.2d at 384, 140 Ill. Dec. at 865, 550 N.E.2d at 990. Hackman's failure adequately to allege the existence of an agreement or a conspiracy also dooms his claims under Count II, so I grant Licary and Prudential's motion to dismiss this claim.

Because I grant Licary and Prudential's motion to dismiss Counts I and II on this ground, I need not consider their other arguments that these claims fail because Hackman has not alleged damages caused by an antitrust injury, has failed to appropriately allege interstate commerce, has not established that he filed his claims within the limitations period, and has not pled properly facts showing the existence of a monopoly. I note, however, that there is no obligation under the federal rules to negate affirmative defenses, so there is no cause to dismiss Hackman's claims based on the statute of limitations.[10] *See, e.g. Tregenza v. Great Am. Communications Co.*, 12 F.3d 717, 718-19 (7th Cir. 1993). I also note that it does appear that Hackman has not made the proper jurisdictional allegations concerning the effect of defendants' purported actions on interstate commerce, although this can be easily remedied given that the Supreme Court has previously concluded that even local real estate transactions have an effect on interstate commerce. *See McLain*, 444 U.S. at 245.

---

[10]Hackman alleges that his dispute with the defendants began in 2000, but he does not allege any facts showing when their purported conspiracy to shut him out of the Rockford-area real estate market began.

B.  Count V

Licary and Prudential have also moved to dismiss the claims brought against them in Count V of Hackman's complaint.  Both are named as defendants in this claim, which generally alleges that the named defendants made derogatory and defamatory statements about Hackman to Hackman's clients, agents and other third parties, including statements relating to Hackman's personal and business integrity.  (Compl. at ¶ 80.)  Specifically, the complaint alleges that on May 10, 2005, Hackman signed a listing contract with a particular client to sell the client's house, and subsequently signed a sales contract with a Prudential agent to sell the house to a Prudential client.  (*Id.* at ¶ 78.)  When Hackman did not receive an expected request for extension on the offer, he called the Prudential agent and learned that Licary, a representative of Prudential, had told the Prudential agent that Hackman "was dishonest and not to go through with the deal."  (*Id.*)  The Prudential agent subsequently told his client this, and Hackman lost the sale and his client.  (*Id.*)  Hackman alleges that the defendants named in Count V made statements that constitute "slander *per se*."  (*Id.* at ¶ 81.)  Licary and Prudential argue that Count V should be dismissed as to them because it does not specifically allege the statements made, to whom they were made, and their context, and that the alleged statements do not

constitute defamation *per se*.  I deny Licary and Prudential's motion to dismiss Count V.

First, I agree that the only plausible reading of the complaint is that Hackman alleges defamation against a corporate entity, since the complaint is brought only on behalf of the companies as which Hackman did business.  A statement is defamatory under Illinois law if it "tends to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with him." *Kolegas v. Heftel Broad. Corp.*, 154 Ill.2d 1, 10, 180 Ill. Dec. 307, 312, 607 N.E.2d 201, 206 (Ill. 1992) (citation omitted). Although normally a plaintiff alleging defamation must allege that he was damaged by the defendant's actions, certain categories of defamation considered defamation *per se* require no proof of actual damages.  *Bryson v. News Am. Publ'ns, Inc.*, 174 Ill.2d 77, 87, 220 Ill. Dec. 195, 202, 672 N.E.2d 1207, 1214 (1996) (citations omitted).  Recognized categories of defamation *per se* under Illinois law relevant to this case include words implying "an inability to perform or want of integrity in the discharge of duties of office or employment" or "prejudice a party, or impute lack of ability, in his or her trade, profession or business." *Kolegas*, 154 Ill.2d at 10, 180 Ill. Dec. at 312, 607 N.E.2d at 206 (citation omitted).

Given the specific allegations about Licary's statement to a Prudential agent that Hackman was dishonest, Licary and Prudential's argument that Hackman has not specifically alleged the defamatory statement at issue is without merit. Hackman fairly specifically alleges the statement made, the time it was made, and the context of the statement. Further, a statement that Hackman is "dishonest" falls into the realm of defamation *per se* because it suggests that Hackman as an individual or corporate entity lacks integrity.[11] Because Licary and Prudential's arguments in support of dismissal are without merit, I deny their motion to dismiss Count V.

## C. Count VI

Count VI brings a claim for tortious interference with business expectancy against certain defendants including Prudential and Licary. Count VI makes specific allegations about certain

---

[11]Hackman's complaint lumps together defamation claims on behalf of Gregory Hackman Realtors and Hackman Realtors Inc., referring to both collectively as "Hackman." Defamation allegations on behalf of either entity are sufficient to state a claim. A certain line of Illinois appellate cases suggests that corporate plaintiffs bringing claims for defamation *per se* must allege that the defendant made a statement that "assail[s] a corporation's financial or business methods" or accuses the corporation of fraud or mismanagement. *See, e.g.*, *Am. Int'l Hosp. v. Chicago Tribune Co.*, 136 Ill. App. 3d 1019, 1024, 91 Ill. Dec. 479, 483, 483 N.E.2d 965, 969 (Ill. App. Ct. 1985) (citations omitted). Even under this stricter application of the *per se* rule Hackman's complaint states a claim because it alleges that Licary stated the collective "Hackman" was dishonest, which is akin to an accusation of fraud. Licary and Prudential have cited no cases that a false statement that a corporate entity was dishonest is not within the definition of *per se* defamation under Illinois law.

actions taken by certain defendants to interfere with his business expectancy, but makes no specific allegations about actions Prudential and Licary took. Hackman generally alleges that he had valid business expectancy with his agents, and that defendants knew of that expectancy but interfered with his business relationships "by ingratiating themselves with said clients, and making derogatory statements about HACKMAN until the client left HACKMAN and went to the Defendants' offices." (Compl. at ¶¶ 94-96.) Hackman alleges that defendants also interfered with his business relationships by "making derogatory statements about HACKMAN to its agents, and refusing to do business with those agents as long as they continued to work for HACKMAN, until the agents quit HACKMAN'S employ." (*Id.* at ¶ 97.) Prudential and Licary argue this claim should be dismissed because Hackman has not properly alleged any specific wrongful conduct, that he had a legitimate expectation of entering into a relationship with an identifiable party, or that Prudential and Licary intentionally or maliciously interfered with that expectancy. I grant their motion to dismiss this claim.

Hackman identifies his claim in Count VI as a claim for tortious interference with business expectancy. Although Prudential and Licary contend that Count VI appears to include intermingled allegations of tortious interference with a contractual relationship and tortious interference with economic advantage, Hackman is clearly bringing a claim for tortious

interference with prospective economic advantage.[12]  Establishing

this claim requires that Hackman show (1) his reasonable

expectation of entering into a valid business relationship; (2)

defendants' knowledge of his expectancy; (3) purposeful

interference by the defendants preventing his expectancy from being

fulfilled; and (4) damages resulting from such interference.

*Burrell v. City of Mattoon*, 378 F.3d 642, 652 (7th Cir. 2004)

(citations omitted).  Hackman has alleged that he had a reasonable

expectation of continuing business relationships with the agents

who worked for him as well as the clients whom he represented.

*See, e.g., Dorado v. Aargus Sec. Sys., Inc.*, No. 00 C 4002, 2002 WL

230776, at *5 (N.D. Ill. Feb. 14, 2002) (claim may be brought where

plaintiff had a reasonable expectation of continuing a business

relationship) (citation omitted).  He has alleged that defendants

knew of that expectation but intentionally interfered by making

derogatory statements about him to his clients and agents and

refusing to do business with his agents, causing them to go

---

[12]Illinois courts have variously designated this tort as interference with prospective economic advantage, *Fellhauer*, 142 Ill.2d at 511, 154 Ill. Dec. at 656-57, 568 N.E.2d at 877-78, interference with prospective economic relationships, *Kruger v. Menard Elec. Coop.*, 169 Ill. App. 3d 861, 864-65, 119 Ill. Dec. 952, 954, 523 N.E.2d 708, 710 (Ill. App. Ct. 1988), and interference with prospective business expectancies, *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 190 Ill. App. 3d 524, 527, 137 Ill. Dec. 409, 412, 546 N.E.2d 33, 36 (Ill. App. Ct. 1989).  The Restatement uses the term interference with prospective contractual relation. 4 Restatement (Second) of Torts § 766 B (1979).

elsewhere. Hackman has therefore pled the bare bones element of his claim. He has not, however, specified any particular wrongful conduct that Licary or Prudential committed to interfere with his expectancy, other than generally alleging that they made derogatory statements about Hackman and refused to do business with his agents. To be actionable, defendants' conduct must be wrongful, such as fraudulent, deceitful, intimidating, or deliberately disparaging. *Am. Broad. Co. v. Maljack Prods., Inc.*, 34 F. Supp 2d. 665, 674 (N.D. Ill. 1998) (citations omitted). The inference from Hackman's complaint might be that defendants' conduct is wrongful because it was in violation of the Sherman Act (refusing to do business with Hackman's agents) or defamatory (making false disparaging statements) but this is not clear from the complaint. I agree that without more detailed factual allegations it is not clear what Licary or Prudential did that was wrongful that interfered with Hackman's economic advantage. Hackman's allegations do not raise the right to relief above a speculative level. *Bell Atl.*, 127 S. Ct. at 1964. Therefore, I grant Licary and Prudential's motion to dismiss Hackman's claims against them in Count VI.

### D. Conclusion

For the above reasons, I grant Licary and Prudential's motion to dismiss Counts I, II, and VI, and deny their motion to dismiss Count V.

36

## V.  Parvin's Motion to Dismiss

Parvin has also brought a motion to dismiss Hackman's claims against her in Count VI of the complaint.  As discussed above in Section II *supra*, the portion of Count VI alleging that Parvin violated MLS rules by misrepresenting the status of a property to prevent Hackman from presenting an offer is subject to an arbitration agreement, and is therefore stayed.  Because I have ruled this claim is subject to arbitration I deny Parvin's motion to dismiss as moot.  *See, e.g.*, *Olson v. Jensen & Gilchrist*, 461 F. Supp 2d. 710, 727-28 & n.11 (N.D. Ill. 2006) (citing cases and explaining that when a court grants a motion for arbitration it should be careful not to rule on any issues going to the merits of the claim to be arbitrated).  To the extent Count VI states other allegations of conduct against Parvin as part of the general allegations that all defendants tortiously interfered by defaming Hackman and shutting him out of the real estate market in Rockford, those portions of Count VI are dismissed as to Parvin for the same reasons articulated in Section IV.C. *supra*.

## VI.  Smith's Motion to Dismiss

Smith has also brought a motion to dismiss Count VI of Hackman's complaint.  The complaint alleges that Smith acted as an agent of Dickerson.  Count V, which is incorporated into Count VI, alleges that agents and employees of Dickerson made derogatory and defamatory statements about Hackman's personal and business

integrity, and that certain of these statements made by unnamed agents of Dickerson caused the sellers of a property identified as "7371 Countryshire" to refuse to re-list with Hackman. (Compl. at ¶¶ 79-80.) Count VI of Hackman's complaint specifically alleges that Smith's boycott of Hackman and refusal to set up a showing with a former Hackman realtor caused one of Hackman's realtors to quit. (*Id.* at ¶ 84.) Count VI alleges that unnamed agents of Dickerson made derogatory statements about Hackman's business integrity and honesty in April of 2002, causing Vickie Stearns, a former Hackman agent, to lose a client. (*Id.* at ¶ 83.) Smith argues that Count VI fails to state a claim because Hackman does not allege that Smith refused to deal with Hackman's agent without justification, and does not allege that he had a legally binding contract with his agent. I deny this motion.

Smith is incorrect that Hackman must have had a contract with his agent in order for an interference with their relationship to constitute a tortious interference with business expectancy. The case that Smith cites for this proposition, *Lusher v. Becker Bros., Inc.*, 155 Ill. App. 3d 866, 108 Ill. Dec. 748, 509 N.E.2d 444 (Ill. App. Ct. 1987) held that the plaintiff, the employee of a subcontractor, did not have a cause of action against the contractor for conditioning its work with the subcontractor on the subcontractor's not using the plaintiff on any of its jobs. *Id.* at 870, 108 Ill. Dec. at 750, 509 N.E.2d at 446. The court concluded

this was so because, although the plaintiff had a reasonable expectation of being hired by the subcontractor, the plaintiff had not shown that he had a reasonable expectation of further work on the contractor's jobs with the subcontractor. *Id.* In this case, however, Hackman has alleged that Smith's boycott of Hackman (which may be reasonably inferred to be in violation of the Sherman Act and therefore improper) caused Hackman's agent to quit, and that but for Smith's action Hackman had a reasonable expectation of a continuing business relationship with the agent. Nothing about the holding of *Lusher* specifically requires that an employer or employee have an employment contract in order for one of them to have a reasonable expectation of continuing to work with the other, but simply that the plaintiff be able to show that under the circumstances there was some reasonable expectation that their relationship would continue. Here Hackman has met that burden, so I deny Smith's motion to dismiss.

## VII.  Reavis's Motion to Dismiss

Reavis has also moved to dismiss Count VI of Hackman's complaint. Count V (incorporated into Count VI) alleges that in early 2005 Reavis, an agent of Dickerson, made "slanderous and derogatory statements about HACKMAN's business integrity" that caused Hackman to lose a showing of a client's property and to lose the listing of the property; Reavis subsequently signed the clients in alleged violation of NAR rules. (Compl. at ¶ 77.) Count VI

alleges that Reavis stole a client of one of Hackman's agents, and that when a resulting commission dispute arose between Hackman and Dickerson, Reavis caused the client to write an ethics complaint against Hackman, causing Hackman's agent to quit Hackman's employ. (*Id.* at ¶¶ 87-88.) Reavis argues that Count VI fails to state a claim because Hackman has failed to allege that there was a legally binding contract that Reavis had knowledge of or that Reavis's actions were not privileged; that the filing of a quasi-judicial proceeding by any party is privileged; and that Hackman is attempting to bootstrap all asserted actions by all defendants into a claim against Reavis as an individual. I deny Reavis's motion.

First, as discussed in Section IV.C. *supra*, to establish a claim for tortious interference with business expectancy Hackman must show that he had a reasonable expectation of entering into a valid business relationship and that Reavis knew of his expectancy. *Burrell*, 378 F.3d at 652 (citations omitted). Although Reavis attempts to argue, citing *Film and Tape Works, Inc. v. Junetwenty Films, Inc.*, 368 Ill. App. 3d 462, 305 Ill. Dec. 807, 856 N.E.2d 612 (2006), that Hackman must allege there was a legally binding contract between himself and the client in order to satisfy that element of the claim, this is incorrect. Hackman's claim is for tortious interference with business expectancy, not tortious interference with contract, and although these torts "are closely related . . . the former requires a mere business expectancy while

40

the latter applies only where there is a legally binding contract between the parties." *Film and Tape Works, Inc.*, 368 Ill. App. 3d at 468, 305 Ill. Dec. at 813, 856 N.E.2d at 618 (citation omitted). Hackman adequately alleges that he had "valid business relationships, and the expectancy of the completion of those relationships with [his] clients as described above by virtue of the respective Exclusive Listing Agreements." (Compl. at ¶ 92.) As the Illinois appellate court concluded in the very case that Reavis cites, an existing relationship predicated upon an ongoing course of dealing, even if terminable at will, is sufficient to support a claim for tortious interference with business expectancy as long as it will presumptively continue if the parties are satisfied. *See Film and Tapes Works, Inc.*, 368 Ill. App. 3d at 469, 305 Ill. Dec. at 814, 856 N.E.2d at 619. Hackman's allegations are sufficient to support this inference. In addition, although Reavis argues that Hackman has not alleged that Reavis knew of this expectancy, Hackman has specifically pled that defendants, "as individuals, knew Hackman had said relationships with the above-referenced clients." (Compl. at ¶ 93.)

Second, Reavis urges that her actions were privileged as competition. As discussed above, to be tortious Reavis's actions must have somehow been improper, and lawful competition is normally not tortious unless it encompasses fraud, intimidation, or disparagement. *Belden Corp. v. Internorth, Inc.*, 90 Ill. App. 3d

547, 551-53, 45 Ill. Dec. 765, 768-770, 413 N.E.2d 98, 101-03 (Ill. App. Ct. 1980). Hackman correctly notes in his response that raising the privilege of competition is an affirmative defense and cannot form the basis of a motion to dismiss. *See Zenith Electronics Corp. v. Exzec Inc.*, No. 93 C 5041, 1997 WL 798907, at *14-15 (N.D. Ill. Dec. 24, 1997). Regardless, as discussed in Section IV.C. *supra*, a reasonable inference from Hackman's allegations is that Reavis's actions in taking a client and causing the filing of an ethics complaint against Hackman's agent, as well as making false and derogatory statements about his integrity, were improper and not lawful competition. *See, e.g., Baloun v. Williams*, No. 00 C 7584, 2002 WL 31426647, at *16 (N.D. Ill. Oct. 25, 2002) (holding that allegations of "ma[king] defamatory statements regarding [plaintiff's] integrity, honesty, and business practices" sufficiently stated a claim for tortious interference with business expectancy).

Third, Reavis urges that Hackman may not use the filing of an ethics complaint by any party as part of his claim because it is a quasi-judicial proceeding and therefore protected by absolute privilege. It is unnecessary to determine whether the filing of the complaint was a quasi-judicial proceeding and whether this can support a motion to dismiss because a reasonable reading of Hackman's complaint is that he is not alleging that the filing of the complaint itself was necessarily the tortious interference, but

rather that Reavis's statements to the former client causing the complaint to be filed were tortious interference. *See Dowd & Dowd, Ltd. v. Gleason*, 181 Ill.2d 460, 484, 230 Ill. Dec. 229, 242, 693 N.E.2d 358, 371 (1998) ("[T]he focus here is not on the conduct of the client in terminating the relationship, but on the conduct of the party inducing the breach or interfering with the expectancy.").

Finally, Reavis contends that Hackman is attempting to "bootstrap" all of the Defendants' actions together to assert a claim. I agree that Count VI of Hackman's complaint is not always clear as to which allegations apply to which defendants. Regardless, Hackman's specific allegations that are clearly directed at Reavis sufficiently state a claim for tortious interference of business expectancy. Therefore, I deny Reavis's motion to dismiss.

## VIII. Young's Motion to Dismiss

Young has brought two motions to dismiss Counts V and VI of Hackman's complaint against him. Young's name appears in the heading of Count V, Hackman's defamation claim, but there are no specific allegations in that claim against him. Hackman's response acknowledges that the inclusion of Young's name in the header of Count V is a typographical error and that he is not currently asserting any defamation claims against Young, so Young's motion to dismiss Count V is granted.

The only dispute between the parties, then, is Young's motion to dismiss Count VI. In addition to the general allegations against all defendants named in Count VI as discussed in Section IV.C. *supra*, Count VI specifically alleges that in May 2004, Young, an agent of Dickerson, made "false and derogatory statements" to a Hackman client, Don Sandell, that falsely impugned Hackman's "business integrity and honesty." (Compl. at ¶ 89.) As a result, the client left Hackman and signed with Young, causing Young to receive an unearned commission. (*Id.*) As other defendants have argued, Young argues that Hackman's allegations fail to state a claim because Hackman does not allege that a legally binding contract existed between himself and the client, and does not allege that Young's alleged interference was more than privileged business competition. For the same reasons that Reavis's arguments to dismiss Count VI failed, Young's arguments fail as well. Hackman need not allege the existence of a contract, only the existence of a valid business expectancy, and as discussed in Section VII *supra*, the reasonable inference from his allegations is that Young's interference was improper and not mere competition. Therefore, Young's motion to dismiss Count VI is denied.

IX. Reavis Motion for a More Definite Statement

In addition to her motion to dismiss addressed above, Reavis has filed a motion for a more definite statement of Count V of Hackman's complaint, arguing that she is unable to reasonably frame

44

a response to Hackman's claim for defamation because his allegations are too vague.   In Count V, Hackman specifically alleges:

> On January 20, 2005, HACKMAN entered into a Listing Contract with Jeffrey and Kathleen Reimer, for the property commonly known as 10111 Joy Court in Roscoe.   REAVIS had also tried to get the Reimers to sign up.   Two days before the Listing Contract expired, the sellers refused to allow HACKMAN to set up a second showing for the agent of a potential buyer, saying HACKMAN would have to talk to REAVIS of DICKERSON.   Due to slanderous and derogatory statements about HACKMAN'S business integrity made by REAVIS, HACKMAN was denied the second showing, and lost the listing after it expired.   Instead, the Reimers signed with REAVIS, who violated NAR rules in contacting the Reimers.

(Compl. at ¶ 77.)

Under FED. R. CIV. P. 12(e), "[i]f a pleading to which a responsive pleading is permitted is so vague and ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading."   An allegation is considered specific enough to form a responsive pleading "if the statement permits the defendant to understand the specific nature of the claim and form a responsive pleading."  *Giant Green Sports, LLC v. Sky High Entm't*, No. 05 C 7184, 2007 WL 627595, at *3 (N.D. Ill. May 5, 1999) (citations omitted).  Courts in this district have previously held that a complaint for defamation need not quote defamatory language verbatim, but have alternatively granted or denied motions

45

for a more definite statement made on this basis. *See id.* (citations omitted); *Cozzi v. Pepsi-Cola Gen. Bottlers, Inc.*, No. 96 C 7228, 1997 WL 312048, at **5-6 (N.D. Ill. June 6, 1997); *Guy v. Illinois*, 958 F. Supp. 1300, 1311-12 (N.D. Ill. 1997); *Chisholm v. Foothill Capital Corp.*, 940 F. Supp. 1273, 1284-85 (N.D. Ill. 1996). These decisions were all made under the pre-*Bell Atlantic* pleading standards, so it is possible that under *Bell Atlantic* a plaintiff must do more to specifically allege the content of a defamatory statement in order to raise the right to relief above a speculative level. 127 S. Ct. at 1964.

Reavis acknowledges that under the precedent in this district Hackman need not plead the content of the statement verbatim, but nevertheless contends that she is unable to formulate a meaningful response to the allegations that she made "slanderous and derogatory statements," without more detail as to the content and context of the statements. Courts in this district have previously granted motions for more definite statement to require a claimant to more specifically plead facts surrounding the statement, including the content, context, speaker, recipient, and timing of the statement. *See, e.g.*, *Wilton Partners III, LLC v. Gallagher*, No. 03 C 1519, 2003 WL 22880834, at *6 (N.D. Ill. Dec. 5, 2003) (directing plaintiff to amend the complaint "to allege more precisely the content of the allegedly defamatory statements, the context in which those statements were made, as well as the

identities of both the speakers and the individuals to whom the statements were allegedly made."); *Cozzi*, 1997 WL 312048 at *6 ("Nevertheless, in fairness to defendant, the court orders plaintiff [to supplement allegations] to the extent of her current knowledge, with details as to the speaker, recipient, timing, words, and context in which the alleged statements were made.").

Here, Hackman has alleged the general timing of the statement (around January 20, 2005), the general content of the statement (that it was a slanderous and derogatory statement about his business integrity), the speaker (Reavis), and the context (that it was made to deny him a second showing and to encourage Hackman's client to leave him and sign with Reavis). The complaint is unclear about who the recipient of the statement was, but the reasonable inference to be drawn is that the statement was made to Hackman's clients. Other than requiring Hackman to specifically allege the content of the statement, Hackman's allegations are sufficiently detailed. Therefore, a motion for a more definite statement would serve no purpose, and any further information Reavis requires can be obtained through discovery. To the extent Reavis argues she needs more information in order to determine whether she should plead certain affirmative defenses such as innocent construction, Reavis is free to plead whatever affirmative defenses she believes might be applicable, but this should have no bearing on her ability to answer. I therefore deny this motion.

## X. Young, Dunn, Smith and Dickerson Motion
for a More Definite Statement

Defendants Young, Dunn, Smith and Dickerson have also filed a motion for a more definite statement as to Counts I, II, V and VI of Hackman's complaint. Defendants generally contend that these counts violate Federal Rule of Civil Procedure 10, which requires

> All averments of claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances; and a paragraph may be referred to by number in all succeeding pleadings. Each claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth.

FED. R. CIV. P. 10(b). Violation of this rule may be remedied by a motion under Rule 12(e) for a more definite statement. *See Fields v. Vill. of Skokie*, 502 F. Supp. 456, 459-60 (N.D. Ill. 1980). I deny this motion as to Counts I and II, but grant it as to Counts V and VI.

Defendants argue that they cannot respond effectively to Count I, Hackman's Sherman Act claim, because it combines "Greg Hackman's pre-2005 actions" with "Gregory Hackman Realtor, Inc.'s claims for post-2005 actions." This is a frivolous argument. Although there are perhaps deficiencies with Hackman's claims in Count I as noted in response to other defendants' motions, defendants have identified nothing about the combination of these two entities' claims that prevents a clear presentation of the allegations.

48

Hackman's claims seem to be that defendants treated both entities in a similar fashion, so there is nothing about the combination of their claims that would prevent defendants from responding. The same is true with respect to Count II, Hackman's claims under the Illinois Antitrust Act.

Defendants' arguments concerning Counts V and VI are colorable. Count V is a motion for defamation, and does combine into one count numerous allegations about separate instances of defamation by numerous defendants that constitute separate transactions or occurrences. Count VI is likewise a motion for tortious interference with business expectancy that combines allegations about separate instances of tortious interference by numerous defendants. I agree that Hackman's claims concerning these counts would be more clearly presented and would be more easily responded to were Hackman to separate then into separate counts. Therefore, Hackman is directed to file an amended complaint that separates the allegations of Count V and VI to more clearly state his separate claims against the relevant defendants.

XI.

For the above reasons, I grant Parvin's motion to compel arbitration [Docket No. 79] of Hackman's claim concerning Parvin's purported violation of the MLS rules and to stay that aspect of Hackman's claims against her, but I otherwise deny her motion. I deny her motion to dismiss [Docket No. 80] to the extent it

pertains to the claim for which I granted her motion to arbitrate, but otherwise grant that motion. I deny Century 21's motion to compel arbitration [Docket No. 78] as moot given its dismissal from the litigation. I grant RAAR and IAR's motion to dismiss [Docket No. 70] Counts I and II for failure to state a claim, and consequently also dismiss Counts III and IV for lack of subject matter jurisdiction. I grant Licary and Prudential's motion to dismiss [Docket No. 90] as to Counts I, II, and VI, and deny their motion to dismiss as to Count V. I deny Smith and Reavis's motions to dismiss [Docket Nos. 63 and 35, respectively], and deny Reavis's motion for a more definite statement [Docket No. 34]. I grant Young's motion to dismiss Count V [Docket No. 62], but deny its motion to dismiss Count VI [Docket No. 64]. I grant Young, Dunn, Smith and Dickerson's motion for a more definite statement [Docket No. 34] as to Counts V and VI, but deny it as to Counts I and II.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: August 31, 2007