**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, WESTERN DIVISION**

| | | |
|---|---|---|
| GREGORY HACKMAN d/b/a GREGORY HACKMAN REALTORS, and GREGORY HACKMAN REALTORS, INC., an Illinois corporation, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| DICKERSON REALTORS, INC., an Illinois corporation d/b/a DICKERSON-NIEMAN REALTORS, WHITEHEAD, INC., an Illinois corporation, d/b/a WHITEHEAD REALTORS, PREMIER REAL ESTATE BROKERAGE SERVICES, INC., an Illinois corporation, d/b/a COLDWELL BANKER PREMIER, R.CROSBY, INCORPORATED, an Illinois corporation, d/b/a PRUDENTIAL CROSBY REALTORS, McKISKI-LEWIS, INC., an Illinois corporation, d/b/a TOM McKISKI REALTORS, LORI REAVIS, RAY YOUNG, MICHAEL DUNN, MELISSA SMITH, JESSICA LICARY, DIANE PARVIN, FRANK WEHRSTEIN, FRANK SHELEY, MARY WESTIN, LARRY PETRY, ROCKFORD AREA ASSOCIATION OF REALTORS, TERRI HALL, and ILLINOIS ASSOCIATION OF REALTORS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 06 C 50240 |
| Defendants. | ) | |

## AMENDED VERIFIED COMPLAINT AT LAW AND EQUITY

NOW COME the Plaintiffs, GREGORY HACKMAN d/b/a GREGORY HACKMAN

REALTORS, and GREGORY HACKMAN REALTORS, INC., an Illinois corporation and

complaining of the Defendants, DICKERSON REALTORS, INC., an Illinois corporation d/b/a

DICKERSON-NIEMAN REALTORS, WHITEHEAD, INC., an Illinois corporation, d/b/a

WHITEHEAD REALTORS, PREMIER REAL ESTATE BROKERAGE SERVICES, INC., an

Illinois corporation, d/b/a COLDWELL BANKER PREMIER, R.CROSBY, INCORPORATED,

an Illinois corporation, d/b/a PRUDENTIAL CROSBY REALTORS, McKISKI-LEWIS, INC.,

an Illinois corporation, d/b/a TOM McKISKI REALTORS, LORI REAVIS, RAY YOUNG,

MICHAEL DUNN, MELISSA SMITH, JESSICA LICARY, DIANE PARVIN, FRANK

WEHRSTEIN, FRANK SHELEY, MARY WESTIN, LARRY PETRY, ROCKFORD AREA

ASSOCIATION OF REALTORS, TERRI HALL and ILLINOIS ASSOCIATION OF

REALTORS, states and alleges as follows:

## PRELIMINARY STATEMENT

1.     This is an action for compensatory, punitive and injunctive relief arising from

illegal efforts to control the real estate broker commission rates in the Rockford area by (1.)

attempting to intimidate Plaintiff into "charging "a certain commission rate for his real estate

listings, which was higher than what Plaintiff was then-charging; (2.) refusing to deal with

Plaintiff in retaliation for Plaintiff's decision not to charge a certain rate, by refusing to show

properties to Plaintiff's clients, and in refusing to offer Plaintiff the advertised Multiple Listing

Service commission rate; (3.) initiating trumped-up ethics complaints against Plaintiff, in an

effort to tarnish his record and reputation, and to eventually expel HACKMAN from the RAAR

and the IAR, which would also bar HACKMAN from belonging to any MLS in the State of

Illinois; (4.) adversely affecting Plaintiffs' relationships with its clients by interference and by

false statements about Plaintiff to its agents and clients.

## JURISDICTION

2.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. 1331,

which gives the United States District Courts original jurisdiction of all matters arising under the

laws under the United States.  This is a matter brought pursuant to Section 2 of the Sherman Act

(15 U.S.C. 1, *et seq.*).

3.     This Court also has ancillary jurisdiction over the remaining Illinois state claims in this Complaint, pursuant to 28 U.S.C. 1367(a), for the other claims are so related to the federal question claims that they form part of the same case or controversy under Article III of the United States Constitution.  This Court additionally has ancillary jurisdiction over the declaratory judgment actions pursuant to 28 U.S.C. 2201-02 (Federal Declaratory Judgment Act).

## VENUE

4.     Venue is proper in this Court under 28 U.S.C. 1391(b)(1) and (2), for almost all Defendants (except for the Illinois Association of Realtors) reside in this District, and a substantial part of the acts and/or omissions that are the subject of this suit occurred in this District.  Additionally, this Court is the proper venue for this matter under 15 U.S.C. 15(a).

## PARTIES

5.     Gregory Hackman is a natural person, who has been in the real estate business for 26 years.  From 1991 - late 2005, he was the sole proprietor of GREGORY HACKMAN REALTORS.  From late 2005 to mid 2007, he was the president and owner of GREGORY HACKMAN REALTORS, INC., an Illinois corporation d/b/a GREGORY HACKMAN REALTORS.  Since mid-2007, he has again acted as a sole proprietor (Plaintiffs hereinafter collectively referred to as "HACKMAN").

6.     DICKERSON REALTORS, INC., an Illinois corporation, d/b/a DICKERSON-NIEMAN REALTORS (hereinafter "DICKERSON"), is a corporation operating under the laws of the State of Illinois, has offices throughout northwest Illinois, and is in the business of representing clients in their sales and purchases of real estate.  In the relevant area, DICKERSON is one of the largest residential realtors, listing approximately fifty percent of the

3

properties on the market at any one time. DICKERSON is one of the Defendants sometimes referred to herein as "the agency Defendants."

7.     WHITEHEAD, INC., an Illinois corporation, d/b/a WHITEHEAD REALTORS (hereinafter "WHITEHEAD"), is a corporation operating under the laws of the State of Illinois, has offices throughout northwest Illinois, and is in the business of representing clients in their sales and purchases of real estate. WHITEHEAD is also considered a large realtor in the Rockford area. WHITEHEAD is one of the Defendants sometimes referred to herein as "the agency Defendants."

8.     PREMIER REAL ESTATE BROKERAGE SERVICES, INC., an Illinois corporation, d/b/a COLDWELL BANKER PREMIER (hereinafter "COLDWELL"), is a corporation operating under the laws of the State of Illinois, and is in the business of representing clients in their sales and purchases of real estate. COLDWELL is one of the Defendants sometimes referred to herein as "the agency Defendants."

9.     R. CROSBY, INCORPORATED, an Illinois corporation, d/b/a PRUDENTIAL CROSBY REALTORS (hereinafter "PRUDENTIAL"), is a corporation operating under the laws of the State of Illinois, and is in the business of representing clients in their sales and purchases of real estate. PRUDENTIAL is one of the Defendants sometimes referred to herein as "the agency Defendants."

10.     McKISKI-LEWIS, INC., an Illinois corporation, d/b/a TOM McKISKI REALTORS, is a corporation operating under the laws of the State of Illinois, and is in the business of representing clients in their sales and purchases of real estate. McKISKI is one of the Defendants sometimes referred to herein as "the agency Defendants."

11.     LORI REAVIS is a natural person residing in the city of Roscoe, County of Winnebago, State of Illinois.  At all relevant times, REAVIS was a licensed real estate agent in the State of Illinois, and was employed by, and/or acting as an agent of, DICKERSON-NIEMAN.

12.     RAY YOUNG is a natural person residing in the City of Roscoe, County of Winnebago, State of Illinois.  At all relevant times, YOUNG was a licensed real estate agent in the State of Illinois, and was employed by, and/or acting as an agent of, DICKERSON-NIEMAN.

13.     MICHAEL DUNN, is a natural person residing in the City of Rockford, County of Winnebago, State of Illinois.  At all relevant times, DUNN was a licensed real estate agent in the State of Illinois, and was employed by DICKERSON-NIEMAN as the General Manager of its Rockford office.

14.     MELISSA SMITH is a natural person residing in the City of Poplar Grove, County of Boone, State of Illinois.  At all relevant times, SMITH was a licensed real estate agent in the State of Illinois, and was employed by, and/or acting as an agent of, DICKERSON.

15.     JESSICA LICARY is a natural person residing in the State of Illinois.  At all relevant times, LICARY was employed by, and/or acting as an agent of, PRUDENTIAL.

16.     DIANE PARVIN is a natural person residing in the State of Illinois. At all relevant times she was a licensed real estate agent in the State of Illinois, and was employed by, and or acting as an agent of Century 21 Country North, Inc. d/b/a Century 21 Country North.

17.     FRANK WEHRSTEIN is a natural person residing in the State of Illinois.  At all relevant times, WEHRSTEIN was a licensed real estate agent in the State of Illinois, and was employed by DICKERSON-NIEMAN as its President.

18.     FRANK SHELEY is a natural person residing in the State of Illinois.  At all relevant times he was a licensed real estate agent in the State of Illinois, and was employed by, and/or acting as an agent of, DICKERSON-NIEMAN.

19.     MARY WESTIN is a natural person residing in the State of Illinois. At all relevant times she was a licensed real estate agent in the State of Illinois, and was employed by, and or acting as an agent of DICKERSON-NIEMAN in a management capacity.

20.     LARRY PETRY is a natural person residing in the State of Illinois. At all relevant times he was a licensed real estate agent in the State of Illinois, and was employed by, and or acting as an agent of, McKISKI.

21.     ROCKFORD AREA ASSOCIATION OF REALTORS (RAAR) is an organization, headquartered in the City of Rockford, County of Winnebago, State of Illinois, which provides and promotes programs, products and services to enhance licensed Realtors' ability to conduct their individual businesses successfully. RAAR takes collective action to promote extension and preservation of the right to own, transfer and use real property. RAAR also engages in education and strict enforcement of the code of ethics in order to enhance the professionalism and image of the licensed Realtor for the benefit of the community.  Also, RAAR serves as a governing body to enforce the regulations in the code of ethics promulgated by the National Association of Realtors, and serves to resolve disputes between licensed Realtors over alleged violations of the NAR regulations.  At all relevant times, agents of DICKERSON held a majority of the positions on the Board of Directors, and other influential positions, within RAAR.

22.     TERRI HALL is a natural person residing in the State of Illinois.  At all relevant times, she was President of RAAR.

23.     ILLINOIS ASSOCIATION OF REALTORS (IAR) is an organization, headquartered in the City of Springfield, County of Springfield, State of Illinois.  The objectives of the Association are (in relevant part, according to its website): to establish and maintain high standards of ethical conduct among its members and those affiliated with them by requiring compliance with the [National Association of Realtors's] Code of Ethics and Code of Equal Opportunity . . . ."  Also, IAR serves as a governing body to enforce the regulations in the code of ethics promulgated by the National Association of Realtors, and serves to resolve disputes between licensed Realtors over alleged violations of the NAR regulations.  IAR also, in proper circumstances, accepts the transfer of local disputes and disciplinary actions for hearings when circumstances are appropriate that the local Association is not suited to hear and decide the dispute or disciplinary action, including after <u>all reasonable efforts</u> to empanel an impartial panel at the local level have failed.

## **FACTUAL BACKGROUND**

24.     The dispute between HACKMAN and the agency and realtor Defendants, who are all members of the area Multiple Listing Services, and RAAR and IAR, began in approximately mid 1999.  HACKMAN had just opened a Belvidere, Illinois office, to better service the Rockford area.  To attract clients, HACKMAN advertised that it would charge a 5% brokerage fee/commission for new clients that retained HACKMAN to list and sell their pre-existing construction.

25.     The "going rate" for commissions for being the listing agent for a pre-existing property in the Rockford area is 6-7%.  This 6-7% commission was at all relevant times charged by all the agency Defendants to sell properties for sellers.  Accordingly, sellers would save 1-2%

of the total commission they would have to pay otherwise if they listed with one of the agency Defendants.

26.     When a property is purchased by a buyer represented by a realty agent, under the MLS Rules (basically governed by Section 5), the selling agent agrees to share the commission with the buyer's agent as advertised in the posted MLS listings, usually equally.  This sharing is referred to in the industry as "the MLS split."  Accordingly, if the selling broker gets 7% commission on the sale of a property, the buyer's agent usually would get 3½% and the broker/seller's/listing agent would receive 3½%.

27.     When HACKMAN reduced his commission rate to 5%, this affected the other brokers in the Rockford area in not only "losing" potential listings as seller's agents, but when acting as buyer's agents under the MLS split guidelines, the purchaser's agent would only receive 2½%.

28.     In response to this new competitive threat, the Defendants DICKERSON, WHITEHEAD, PRUDENTIAL, COLDWELL, McKISKI and RAAR entered into an agreement whereby they would, by and through their agents and/or employees, retaliate against HACKMAN in every facet of his business. These Defendants, by and through their agents and/or employees, refused, and continue to refuse, to present offers on their own listings from potential purchasers represented by HACKMAN.  Defendants further discouraged their seller clients from accepting offers from HACKMAN's purchaser clients, by disparaging HACKMAN. Additionally, the Defendants agreed not to show HACKMAN's listings to their own clients. Further, the Defendants agreed to solicit and prosecute baseless ethics complaints against HACKMAN and its agents to intimidate them and coerce them into raising the commission rates and/or to leave HACKMAN's employ.

29.     As an example, in the summer of 1999 agents of DICKERSON and others told HACKMAN not to take listings at 5%, and stated they were discouraging clients from making offers on HACKMAN listed properties.

30.     In January, 2000, HACKMAN's agent was present at a meeting hosted by WHITEHEAD.  One of the discussed topics of this meeting was the commission rates charged by realtors in the stateline area.  Karen Conti, a management representative of WHITEHEAD, approached HACKMAN's agent and said that a group of realtors, including (but possibly not limited to) the agency Defendants was participating in a boycott of HACKMAN due to his charging lower commission rates than the Defendants, and that the boycott would not be lifted until HACKMAN raised his commission rates to that commensurate with what the agency Defendants charged.

31.     In 2002 FRANK WEHRSTEIN, the president of DICKERSON, attempted to convince the sales representative for the Rockford Register Star to limit HACKMAN's ability to advertise in the newspaper (most of the real estate advertising dollars for the newspaper come from DICKERSON).  During these conversations, Wehrstein called HACKMAN crooked. Though these tactics did not work with the first sales representative, they worked with his successor, and for a period of time in 2003, HACKMAN was effectively banned from advertising in the newspaper.  The true reason for these efforts was not that HACKMAN was actually crooked, which was a false statement, but because of the lower commission HACKMAN charged.  These tactics furthered the boycott against HACKMAN, and was an attempt to enforce the higher commission rate agreed upon by the agency Defendants.

32.     In 2003, PETRY of McKISKI intentionally interfered with the Contract between HACKMAN and the Ruizes, despite knowing of said Contract, by refusing to present an offer to

9

his clients if it came from HACKMAN. PETRY made the Ruizes come to him directly to present the offer, thus cutting HACKMAN out. This was intended to perpetuate the group boycott against HACKMAN.

33.     Further, on November 21, 2003, McKISKI stated it would not allow HACKMAN to show McKISKI's listings, without going through Larry Petry first, who never returned HACKMAN's phone calls, with the result that HACKMAN was not able to set up showings of McKISKI properties. The alleged basis was a dispute over a client. The true basis was the commission rate.

34.     On September 19, 2003, HACKMAN entered into an employment agreement with Jeff DeWitt. Shortly thereafter, DeWitt wrote a buyer's contract for a DICKERSON listed property. DeWitt went to DICKERSON to present the offer and was called into the office of WESTIN, who said "you seem to be a smart guy, why are you working for HACKMAN?" She then said other false and derogatory statements regarding HACKMAN's business integrity and acumen. WESTIN had no business reason to even speak to DeWitt that day, and the sole purpose of WESTIN making these comments was to convince DeWitt to quit HACKMAN's employ. These comments were a significant part of the reason DeWitt eventually quit HACKMAN. These efforts were made in order to perpetuate the boycott against HACKMAN and run it out of business in retaliation over HACKMAN's lower commission rates.

35.     Also in late 2003, REAVIS of DICKERSON stole a client, Greg Willis, from DeWitt. When a commission dispute arose over this between HACKMAN and DICKERSON, REAVIS filed a false ethics complaint against HACKMAN. The purpose of this was to damage HACKMAN's reputation in the community, perpetuate the boycott against HACKMAN, and gain the economic advantage that HACKMAN would have otherwise received.

10

36.     In 2004, RAAR hosted a broker's meeting at RAAR headquarters. Though HACKMAN's office could not attend, representatives from all agency Defendants, and other agencies, were present. During that meeting the agency Defendants and others agreed not to do business with HACKMAN. The reason for this was his lower commission rate, his complaints regarding past retaliation, and the Defendants' desire to preserve its own higher commission rate and run HACKMAN out of business.

37.     Further, on March 6, 2004, DUNN of DICKERSON ordered all DICKERSON offices (except one he could not reach) that HACKMAN agents were boycotted from setting up showings of any DICKERSON-listed properties. On March 8, 2004, HACKMAN made telephone calls to five DICKERSON offices to set up showings for HACKMAN's clients. The six people to whom HACKMAN spoke all refused to set up showings for HACKMAN. HACKMAN was told by receptionists at all but one DICKERSON office in town that DUNN had given orders that none of HACKMAN's realtors, including Greg Hackman himself, could show a DICKERSON listed property.

38.     In May, 2004, YOUNG made false and derogatory statements to one of HACKMAN's clients, Don Sandell, falsely impugning HACKMAN's business integrity and honesty. The client signed with YOUNG, who received a commission from a client he should never have had in the first place.

39.     Also in 2004, DICKERSON management sent an e-mail to its agents falsely stating that HACKMAN was dishonest, and ordering then not to do business with HACKMAN. This was done in order to perpetuate the group boycott of HACKMAN and punish HACKMAN for his charging lower commission rates.

40.     In approximately March 2004, WEHRSTEIN of DICKERSON spoke with Terri Hall, the president of RAAR, about the fact that HACKMAN was charging a 5% commission rate.  Hall told WEHRSTEIN to send HACKMAN a letter that would reduce HACKMAN's commission rate on DICKERSON listed properties so low that it would be impossible for HACKMAN to remain in business.  Since DICKERSON controls nearly 50% of the listings in the relevant area, without receiving the opportunity to be compensated the same as other realtors for selling DICKERSON-listed properties, HACKMAN could not survive.  As a result of this conversation with Hall, which assured WEHRSTEIN that he could engage in this boycott tactic against HACKMAN and be protected by RAAR, in March 2004 WEHRSTEIN of DICKERSON sent HACKMAN such a letter, stating that no matter what commission split was posted through the MLS, HACKMAN would only receive a 1% commission on any DICKERSON listed property.  When Gregory Hackman called WEHRSTEIN a few days later about the letter, WEHRSTEIN told Hackman that HALL had advised him to send the letter.

41.     The above-referenced letter was enforced when HACKMAN sold a DICKERSON listed property in July, 2004, and received a 1% commission at the closing.  When Gregory Hackman complained to DICKERSON, he was called in to DICKERSON for a meeting.  On July 26, 2004, DUNN had Gregory Hackman into his office, where he told Hackman what the "going" commission rates were for new-construction (5%) and pre-existing residential home sales (6-7%).  DUNN said DICKERSON could not compete with the rates HACKMAN was charging, and DUNN "suggested" HACKMAN discontinue its advertised special and raise its commission rates to match everybody else's.  HACKMAN did not respond to this issue, believing it violated antitrust laws to make such an agreement.  DUNN also made

sure Hackman understood DICKERSON would file ethics complaints against HACKMAN if HACKMAN did not cooperate.

42.     On a separate Friday in the summer of 2004, someone from the RAAR office with computer access disabled the Supra Key of Donna Wingert, a HACKMAN agent. Access was not restored until the following Monday. Without a working Supra Key, Wingert could not access home to show to clients that weekend, and prohibited her from acting as a real estate agent that weekend. This event contributed to Wingert leaving HACKMAN's employ, costing HACKMAN the time and money of training and mentoring Wingert.

43.     In May 2005, PRUDENTIAL, by and through LICARY, caused Jon Gates, also of PRUDENTIAL, to cancel a deal to purchase the Rockford property of HACKMAN's client, Phyllis Ripko. LICARY achieved this by telling Gates the false information that HACKMAN was dishonest and not to go through with the deal. LICARY's purpose in deliberately stating this false information and disparaging slander *per se* on HACKMAN's business integrity and competency was to convince Gates and his client not to consummate the contract with HACKMAN and his clients, and to perpetuate the agreed-upon group boycott against HACKMAN. LICARY also previously worked at RAAR and knew of the vendetta against HACKMAN and the efforts against it. As a result of LICARY's deliberate dissemination of the false information to Gates, HACKMAN lost the sale and the client.

44.     On March 20, 2006, SHELEY of DICKERSON presented HACKMAN's (through Gregory Hackman) client's offer to purchase to SHELEY's seller clients, Richard and Lori Bastian. HACKMAN was told to wait in his car. When SHELEY came out he stated the offer was rejected and refused to present a counteroffer, which is common practice. Only after HACKMAN insisted did SHELEY go back and obtain a counteroffer. Eventually a deal was

reached. At the closing, SHELEY told HACKMAN's agent that SHELEY told his clients not to accept Hackman's offer because "HACKMAN's deals never close." This was a false statement intended to perpetuate the group boycott of HACKMAN.

45. On August 10, 2006, PARVIN misrepresented the status of a property (saying it was unavailable) in order to prevent HACKMAN from presenting an offer. The MLS computer system did not reflect that the property was unavailable. The sellers previously confirmed availability of the property with HACKMAN's clients directly. PARVIN's actions resulted in HACKMAN's clients not making the purchase.

46. Despite these events and other efforts, HACKMAN did not discontinue his "discounted" commission rate.

47. Because they would have had to pay a 3.5% commission to any buyer's agent, boycotting HACKMAN from showing their listed properties did not benefit the agency and individual Defendants financially, and it harmed the consumers who were refused access to a large segment of the housing market because they were not permitted to see or place offers on properties listed by the agency Defendants.

48. In addition, the Defendants DICKERSON, WHITEHEAD and COLDWELL have engaged in a sustained and coordinated process of defaming HACKMAN to its clients, trying to convince the clients (both prospective buyers and sellers) to cancel their contracts with HACKMAN and sign with them.

49. Further, the Defendants COLDWELL and DICKERSON then filed false ethics complaints against HACKMAN and its agents to RAAR, which passed them on to IAR.

50. As part of RAAR's agreement, support and assistance in the boycott of HACKMAN, RAAR improperly, through Terri Hall, solicited ethics complaints against

14

HACKMAN, in that when HACKMAN's clients would receive slanderous information about HACKMAN from the Defendants by and through their agents, such as false statements that HACKMAN was dishonest or incompetent, the clients would call HACKMAN to be released from their binding listing agreements. When HACKMAN refused, the clients would be referred to Terri Hall by the Defendants. Rather than first attempting to work out the problem informally, as is RAAR's function (and custom when the agency Defendants are involved), Hall would encourage the client to file an ethics complaint against HACKMAN.

51.     RAAR has an enormous amount of power over a realtor who is a member. RAAR may expel members for ethics violations. RAAR is able to shut off a realtor's Supra Key, which would disallow the realtor to gain access to listed properties. If any of the false ethics complaints against HACKMAN were successful, RAAR could use this as a means to expel HACKMAN from the RAAR, which would eliminate HACKMAN as competition for the agency Defendants, who control much of the policy and activities of the RAAR.

52.     By way of contrast, if a HACKMAN agent contacted Hall and RAAR with a complaint regarding another realtor, their complaints either were ignored, or Hall would chastise the complaining agent, as in a 2004 incident when a HACKMAN agent called Hall to complain that an agency Defendant's agent was refusing to present HACKMAN's agent's offer to purchase. Hall threatened the HACKMAN agent with discipline if she did not somehow present the offer.

53.     This was also the case, for example, in March 1999, when Tonya Ainley, a HACKMAN listing client, wrote a letter to RAAR complaining about another realtor, Laura Haynes, who falsely accused HACKMAN of dishonesty and incompetence, when Ainley did not want to accept Haynes's client's offer. RAAR did nothing until, after much prodding from the

complainant Haynes was found guilty of an ethics violation.  Later, Haynes joined the RAAR

Ethics Committee.  When Gregory Hackman sought to join an RAAR committee in 2004, RAAR

through HALL refused to allow it.  HACKMAN has never been found guilty of any ethics

violations.

54.     Also as part of its agreement and support with/for the agency Defendants, RAAR

attempted to eliminate HACKMAN through the ethics hearings, including attempts to place

persons who are part of the agency Defendants, or who had a dislike for HACKMAN, on the

hearing panel.  When HACKMAN challenged these persons and attempted to select unbiased

persons for the panel, RAAR passed a resolution on July 17, 2003, referring the complaints

against HACKMAN to IAR.  This was against RAAR rules, in that it failed to exhaust efforts to

find an impartial arbitrator among the RAAR membership (there were approximately 1400), and

had the double effect of getting HACKMAN disciplined within the IAR (and potentially

expelled from every MLS in the State of Illinois) if he was found guilty of any of the ethics

complaints.

55.     On February 22, 2005, during a time when IAR had temporarily remanded the

ethics matters back to RAAR, HACKMAN wrote a letter to Terri Hall, challenging the

impartiality of certain RAAR members, and demanding they not be placed on any ethics panel

against him.  Despite this notification, which was in accordance with NAR hearing arbitration

rules, Hall appointed challenged members to sit on the hearing panel against HACKMAN.

56.     For its part IAR, in addition to RAAR, has refused to hear HACKMAN's

arguments regarding defects in the false ethics complaints which mandate dismissal, and also

regarding procedural defects of the proposed hearings which would, at a minimum, require

remand to RAAR to find impartial panel members.

57.     Since the above-referenced occurrences, the aforementioned group boycott has continued, in that the Defendants DICKERSON, WEHRSTEIN, DUNN, REAVIS, WHITEHEAD, PRUDENTIAL, COLDWELL, McKISKI, PETRY, RAAR and HALL entered into an agreement whereby they would, individually and/or by and through their agents and/or employees, continue to retaliate against HACKMAN by (1.) refusing to present offers on their own listings from potential purchasers represented by HACKMAN; and/or (2.) discouraging their seller clients from accepting offers from HACKMAN's purchaser clients, by disparaging HACKMAN.

58.     Also since that time, the Defendants DICKERSON, REAVIS, YOUNG, SHELEY, WHITEHEAD and COLDWELL have engaged in a sustained and coordinated process of defaming HACKMAN to its clients, trying to get the HACKMAN clients (both prospective buyers and sellers) to cancel their contracts with HACKMAN and sign with the Defendants as buyer or seller agent. These Defendants, including McKISKI, have also defamed HACKMAN to its agents, and to other third-parties.

59.     In late 2004, HACKMAN was prepared to purchase a building in Roscoe, Illinois, in order to expand its operations. Due to the actions of the Defendants, HACKMAN was financially forced to abandon those plans, and six of its agents left HACKMAN, with some leaving the business altogether.

60.     Currently, HACKMAN runs its operations out of Gregory Hackman's home office, because the Defendants have effectively run HACKMAN out of everywhere else it has tried to set up. As a proximate result of the Defendants' actions as described herein, HACKMAN has lost considerable sums in lost sales commissions, and had its reputation smeared and tarnished throughout the Rockford area. This has been devastating to

HACKMAN's past business and future prospects, as a realtor's reputation is a key ingredient to its success.

## COUNT I – SHERMAN ACT VIOLATIONS (15 U.S.C. 1 & 2) AGAINST DICKERSON, WEHRSTEIN, DUNN, WESTIN, REAVIS, SHELEY, YOUNG, WHITEHEAD, COLDWELL, PRUDENTIAL, LICARY, McKISKI, PETRY, PARVIN, RAAR and HALL

61.    HACKMAN incorporates and realleges Paragraphs 1 through 60, above, as if fully restated herein.

62.    The providing of real estate brokerage services is a relevant product within the meaning of the Act herein cited.

63.    The relevant geographic market is the Rockford area, which includes all the cities in Winnebago County, and the surrounding counties, where HACKMAN and the Defendants provide real estate brokerage services.

64.    Nevertheless, this matter involves and affects interstate commerce, due to the nature of the real estate industry, and the fact that agents of HACKMAN and the Defendants are licensed to and do sell real estate in both Illinois and Wisconsin to residents of both states (including those persons moving across state lines), they are all members of RAAR and the South Central Wisconsin MLS (among others), and they all use multi-state lenders who write federally insured loans for the purchases of properties in both Illinois and Wisconsin.

65.    The Defendants are among the largest realtors in the Rockford area, if not the largest, with a large percentage of the total market share.

66.    Substantial barriers exist for HACKMAN, and any other small realtor the Defendants decide to boycott, in the relevant market.

67.    The Defendants have the power, through their market share and influence within the RAAR, to control commission rates charged to consumers and to exclude any realtor who

attempts to charge a consumer less of a commission. This is through group boycott, and by policy and decision making within the RAAR that has the ultimate effect of shielding the Defendants and punishing the individual, non-conforming realtor.

68. DICKERSON, DUNN, WEHRSTEIN, WESTIN, REAVIS, SHELEY, YOUNG, WHITEHEAD, COLDWELL, PRUDENTIAL, LICARY, McKISKI, PETRY and PARVIN, with the encouragement, support and assistance of RAAR and HALL, have engaged in unfair anticompetitive behavior by agreeing to boycott HACKMAN, by refusing to offer the same commission as all other MLS members, refusing to allow HACKMAN to show properties listed by the Defendants, and/or soliciting and prosecution of baseless and false ethics complaints.

69. In addition, the agency Defendants engaged in other forms of a horizontal boycott and unreasonable and unfair anti-competitive measures, by making derogatory statements about HACKMAN to other realtors and clients, and bringing false ethics complaints when HACKMAN asserts its rights with regards to a client.

70. These actions violate Sections 1 and 2 of the Sherman Act (15 U.S.C. 1 & 2), in that they intentionally constitute an illegal conspiracy to conduct a group boycott of HACKMAN by the holders of a large share of the Rockford area real estate market. The purpose was not to reduce costs or increase performance, nor was there any legitimate business justification for these actions. The boycott and other actions were solely anti-competitive measures to force HACKMAN, a small realtor charging less commission to consumers, out of the market.

71. As a proximate result of the Defendants' actions, HACKMAN has been damaged, in the loss of current and potential clients, including but not limited to those listed above, the loss of sales and commissions, and in reputation. In addition, as a result of these

Defendants' actions, the real estate market in the Rockford area has suffered from artificially high commission charges.

72.     In late 2004, HACKMAN was prepared to purchase a building in Roscoe, Illinois, in order to expand its operations.  Due to the actions of these Defendants, HACKMAN was financially forced to abandon those plans, and six of its agents left HACKMAN, with some leaving the business altogether.

73.     Currently, HACKMAN runs its operations out of Gregory Hackman's home office, because the Defendants have effectively run HACKMAN out of everywhere else it has tried to set up.

74.     As a proximate result of the Defendants' actions as described above, HACKMAN has lost considerable sums in lost sales commissions, and had its reputation smeared and tarnished throughout the Rockford area.  This has been devastating to HACKMAN's past business and future prospects, as a realtor's reputation is a key ingredient to its success.  Further, the solicited and baseless ethics complaints have threatened HACKMAN's statewide MLS status and, by extension, its livelihood.

75.     As a proximate result of the Defendants' actions, HACKMAN has been damaged in an amount to exceed FIVE HUNDRED THOUSAND DOLLARS ($500,000.00).

WHEREFORE, the Plaintiffs, GREGORY HACKMAN d/b/a GREGORY HACKMAN REALTORS, and GREGORY HACKMAN REALTORS, INC., an Illinois corporation, request this Honorable Court to enter judgment in their favor and against the Defendants, DICKERSON REALTORS, INC., an Illinois corporation d/b/a DICKERSON-NIEMAN REALTORS, FRANK WEHRSTEIN, MICHAEL DUNN, MARY WESTIN, LORI REAVIS, FRANK SHELEY, RAY YOUNG, WHITEHEAD, INC., an Illinois corporation, d/b/a WHITEHEAD REALTORS,

PREMIER REAL ESTATE BROKERAGE SERVICES, INC., an Illinois corporation, d/b/a

COLDWELL BANKER PREMIER, R.CROSBY, INCORPORATED, an Illinois corporation,

d/b/a PRUDENTIAL CROSBY REALTORS, JESSICA LICARY, McKISKI-LEWIS, INC., an

Illinois corporation, d/b/a TOM McKISKI REALTORS, LARRY PETRY, DIANE PARVIN,

ROCKFORD AREA ASSOCIATION OF REALTORS and TERI HALL, for an amount to

exceed FIVE HUNDRED THOUSAND DOLLARS ($500,000.00), plus all statutory damages

allowed under the Sherman Act (per 15 U.S.C. 15),  including reasonable attorney's fees, a

recoupment of all costs expended in prosecuting this suit, and any and all further relief as this

court deems just and proper.

## COUNT II – VIOLATIONS OF ILLINOIS ANTITRUST ACT AGAINST DICKERSON, WEHRSTEIN, DUNN, WESTIN, REAVIS, SHELEY, YOUNG, WHITEHEAD, COLDWELL, PRUDENTIAL, LICARY, McKISKI, PETRY, PARVIN, RAAR and HALL

76.     HACKMAN incorporates and realleges Paragraphs 1 through 60, above, as if

fully restated herein.

77.     HACKMAN incorporates and realleges Paragraphs 61 through 69 of Count I,

above, as if fully restated herein.

78.     DICKERSON, WEHRSTEIN, DUNN, WESTIN, REAVIS, SHELEY, YOUNG,

WHITEHEAD, COLDWELL, PRUDENTIAL, LICARY, McKISKI, PETRY and PARVIN,

with the support, encouragement and assistance of RAAR and HALL, engaged in unfair

anticompetitive behavior by agreeing to boycott HACKMAN, by refusing to offer the same

commission as all other MLS members, refusal to allow HACKMAN to show properties listed

by the Defendants, refusal to show their clients properties listed by HACKMAN, and/or

soliciting and prosecution of baseless and false ethics complaints.

79.     In addition, the agency and realtor Defendants engaged in other forms of a horizontal boycott, by making derogatory statements about HACKMAN to other realtors and clients, and bringing false ethics complaints when HACKMAN asserts its rights with regards to a client.

80.     The agency and realtor Defendants' conduct, as well as that of RAAR and HALL, violates Section 3(1)(a) the Illinois Antitrust Act (740 ILCS 10/1, *et seq.*) (hereinafter "the IL Act"), by virtue of boycotting HACKMAN for refusing to charge the "going rate" for commissions for the sale/purchase of residential real property.

81.     The agency and realtor Defendants' conduct, as well as that of RAAR and HALL, namely the agreement to boycott HACKMAN, by refusing to offer the same commission as all other MLS members, and/or refusing to allow HACKMAN to show properties listed by the Defendants, violates Section 3(2) of the IL Act for being a conspiracy to unreasonably restrain trade and commerce.

82.     Said conduct of the agency and realtor Defendants, as well as RAAR and HALL, also violates Section 3(3) of the IL Act because their actions constitute attempts to create a monopoly on the Rockford area real estate market for the purposes of excluding competition.

83.     These actions not only severely damage HACKMAN, but also damage the entire real estate market in the Rockford, Illinois area.

84.     This matter involves and affects interstate commerce, due to the nature of the real estate industry, and the fact that agents of HACKMAN and the Defendants are licensed to and do sell real estate in both Illinois and Wisconsin to residents of both states (including persons moving across state lines), they are all members of RAAR and the South Central Wisconsin

MLS (among others), and they all use multi-state lenders who write federally insured loans for the purchases of properties in both Illinois and Wisconsin.

85. As a proximate result of these Defendants' actions, HACKMAN has been damaged as well as the real estate market in the Rockford area, in the loss of clients, including but not limited to those listed above, the loss of sales and commissions, and in reputation. Further, the solicited and baseless ethics complaints have threatened HACKMAN's statewide MLS status and, by extension, its livelihood.

86. As a proximate result of the Defendants' actions, HACKMAN has been damaged in an amount to exceed FIVE HUNDRED THOUSAND DOLLARS ($500,000.00).

WHEREFORE, the Plaintiffs, GREGORY HACKMAN d/b/a GREGORY HACKMAN REALTORS, and GREGORY HACKMAN REALTORS, INC., an Illinois corporation, requests this Honorable Court to enter judgment against the Defendants, DICKERSON REALTORS, INC., an Illinois corporation d/b/a DICKERSON-NIEMAN REALTORS, FRANK WEHRSTEIN, MICHAEL DUNN, MARY WESTIN, LORI REAVIS, FRANK SHELEY, RAY YOUNG, WHITEHEAD, INC., an Illinois corporation, d/b/a WHITEHEAD REALTORS, PREMIER REAL ESTATE BROKERAGE SERVICES, INC., an Illinois corporation, d/b/a COLDWELL BANKER PREMIER, R.CROSBY, INCORPORATED, an Illinois corporation, d/b/a PRUDENTIAL CROSBY REALTORS, JESSICA LICARY, McKISKI-LEWIS, INC., an Illinois corporation, d/b/a TOM McKISKI REALTORS, LARRY PETRY, DIANE PARVIN, ROCKFORD AREA ASSOCIATION OF REALTORS and TERRI HALL, for an amount to exceed FIVE HUNDRED THOUSAND DOLLARS ($500,000.00), plus all statutory damages allowed under the Illinois Antitrust Act, including reasonable attorney's fees, a recoupment of all

costs expended in prosecuting this suit, and any and all further relief as this court deems just and proper.

## COUNT III – TEMPORARY INJUNCTION AGAINST RAAR AND IAR

87.     HACKMAN incorporates and realleges Paragraphs 1 through 60, above, as if fully restated herein.

88.     On August 30, 2004, REAVIS filed a false ethics complaint against Gregory Hackman.  The alleged matter arose from the property commonly known as 335 Perry Avenue, South Beloit, Illinois.  REAVIS alleged Hackman committed thirty ethics violations arising from this one property.

89.     Ethics complaints within the RAAR are governed by the Code of Ethics and Arbitration Manual, a publication of the National Association of Realtors ("Manual").

90.     As part of its agreement, support and encouragement of the boycott against HACKMAN, and as part of the scheme to run HACKMAN out of business, RAAR failed to follow its own procedures stated in the Manual, and therefore have improperly ceded jurisdiction of this matter, and improperly failed to dismiss this matter, for the following reasons:

   a.  Failure of the RAAR Grievance Committee to properly review REAVIS's Complaint and see that the alleged violations fall outside the 180 day limitation period for filing an Ethics Complaint, per Part 4, Section 20(a) of the Manual, from when REAVIS could have known, in the exercise of reasonable diligence, of the facts giving rise to the alleged violations (this alone renders the ethics complaint false);

   b.  Failure to exhaust all reasonable efforts to impanel an impartial panel among the qualified RAAR membership, per Paragraph 18 of the "Statements of

24

Professional Standards Policy Applicable to Ethics Proceedings" in the

Manual;

c.   Improperly ceding jurisdiction of this matter to IAR despite failing to comply

with the above-referenced Paragraph 18;

d.   Improperly failing to dismiss this matter on two occasions, and instead

improperly imposing continuances, when there were no written requests for

postponement, there is no evidence the Chair of the panel gave permission for

either continuance, per Part 5, pp.73-74 of the Manual.

91.   Though IAR originally remanded the matter back to RAAR on February 24, 2006,

noting that it had no RAAR resolution or action that forwarded the matter to IAR, it improperly

assumed jurisdiction of this matter on August 1, 2006, despite the same failure, as well as the

other above-described failures of RAAR to follow its procedures per the Manual, said failures

being a part of RAAR and HALL's cooperation in the improper anticompetitive actions taken

against HACKMAN.

92.   In addition to the above, Hackman agreed on five potential panel members, from

who a panel of three was to be chosen.  RAAR had the obligation to empanel a panel and notify

HACKMAN of the selected panel, from HACKMAN's unchallenged list, within a certain

amount of time after receiving HACKMAN's list of acceptable potential panelists.  On two

occasions, RAAR failed to comply with this obligation.  Therefore, there was no reason for

RAAR to cede jurisdiction, or for IAR to take it.

93.   IAR is planning to schedule an ethics hearing at an unknown future date.

HACKMAN has not had notification of any selected panel.

94.     HACKMAN has a clearly ascertainable right to be protected, in that his unblemished record within the RAAR is threatened, he faces potential administrative and financial penalties, all to his, and the office's, detriment.

95.     HACKMAN has no remedy at law, because IAR has not only expressed its intent to take jurisdiction of the proceeding, but also to actually conduct the proceeding, all to HACKMAN's detriment.

96.     HACKMAN will be irreparably harmed if he is forced to proceed with an improper and false ethics hearing conducted against him, due to the potential sanctions involved (including being barred from every MLS in the State of Illinois), and the unfair damage to his reputation, plus the effect said actions have as being a part of RAAR and HALL's cooperation in the improper anticompetitive actions taken against HACKMAN.

97.     The parties can be restored to *status quo*, by entering an injunction preventing the ethics hearing from proceeding until the Court has the opportunity to consider a permanent injunction.

98.     HACKMAN has a likelihood of succeeding on the merits in his request for a temporary injunction, given the evidence that neither RAAR nor IAR has jurisdiction of this matter, that the deadline for filing has passed when the complaint was filed, and that neither RAAR nor IAR followed its own procedures and rules regarding this matter.

WHEREFORE, the Plaintiff, GREGORY HACKMAN d/b/a GREGORY HACKMAN REALTORS, requests this Honorable Court to enter a temporary injunction against the ROCKFORD AREA ASSOCIATION OF REALTORS and the ILLINOIS ASSOCIATION OF REALTORS, enjoining them from conducting the ethics hearing against HACKMAN until such

time as the Court can conduct a full hearing on the merits. HACKMAN also requests any and all further relief as this Court deems appropriate.

## COUNT IV – DECLARATION OF RIGHTS, AND PERMANENT INJUNCTION AGAINST RAAR AND IAR

99.     HACKMAN incorporates and realleges Paragraphs 1 through 60, above, as if fully restated herein.

100.     HACKMAN incorporates and realleges Paragraphs 88 through 96 of Count III as if fully restated herein.

101.     HACKMAN seeks (1.) a declaration that RAAR and IAR violated their respective procedures with regards to ethics investigations and hearings, and that the ethics matter should be dismissed, and (2.) an injunction against RAAR and IAR from proceeding with the ethics hearing.

WHEREFORE, the Plaintiff, GREGORY HACKMAN d/b/a GREGORY HACKMAN REALTORS, requests this Honorable Court to (1.) enter a declaratory judgment in HACKMAN's favor that the ROCKFORD AREA ASSOCIATION OF REALTORS and the ILLINOIS ASSOCIATION OF REALTORS violate their procedures for investigating and conducting ethics hearings and that said ethics complaint should be dismissed, (2.) enter an injunction permanently enjoining RAAR and IAR from conducting the ethics hearing against HACKMAN. HACKMAN also requests any and all further relief as this Court deems appropriate.

## COUNT V – DEFAMATION AGAINST DICKERSON, REAVIS, PRUDENTIAL, LICARY, WHITEHEAD, COLDWELL and McKISKI

102.     HACKMAN incorporates and realleges Paragraphs 1 through 60, above, as if fully restated herein.

103.    On January 20, 2005, HACKMAN entered into a Listing Contract with Jeffrey and Kathleen Reimer, for the property commonly known as 10111 Joy Court in Roscoe. REAVIS had also tried to get the Reimers to sign up.  Two days before the Listing Contract expired, the sellers refused to allow HACKMAN to set up a second showing for the agent of a potential buyer, saying HACKMAN would have to talk to REAVIS of DICKERSON.  Due to slanderous and derogatory statements about HACKMAN's business integrity made by REAVIS, HACKMAN was denied the second showing, and lost the listing after it expired.  Instead, the Reimers signed with REAVIS.

104.    On May 10, 2005, HACKMAN signed a Listing Contract with Phyllis Ripko, to sell her property at 2629 Hanson Street in Rockford.  The Contract was valid until February 10, 2006, cancelable at anytime.  On May 27, 2005, Jon Gates of PRUDENTIAL presented HACKMAN with an offer to purchase the property for $56,900.00.  Gates presented the offer on behalf of Turned Around Properties, which was owned by Joseph Gates, the father of Jon Gates. Due to the illegibility of the original offer due to changes and facsimiles, a second offer for the same amount was presented on June 2, 2005, and the Sales Contract was signed by both parties. When an expected request for extension was not received by HACKMAN, and a call was placed to Gates about it, HACKMAN learned PRUDENTIAL, by and through LICARY, had told Gates, who related the information to his father/client, that HACKMAN was dishonest and not to go through with the deal.  HACKMAN lost the sale and the client due to the slander.

105.    In March 2006, HACKMAN attempted to re-list the property commonly known as 7371 Countryshire.  The sellers refused to re-list with HACKMAN, citing derogatory statements made to them by certain agents of the Defendants.

106.    On or about March 20, 2006, SHELEY of DICKERSON presented HACKMAN's (through Gregory Hackman) client's offer to purchase to Sheley's seller clients, Richard and Lori Bastian.  HACKMAN was told to wait in his car.  When Sheley came out he stated the offer was rejected and refused to present a counteroffer, which is common practice.  Only after HACKMAN insisted did SHELEY go back and obtain a counteroffer.  Eventually a deal was reached.  At the closing, SHELEY told HACKMAN's agent that SHELEY told his clients not to accept Hackman's offer because "HACKMAN's deals never close."  This was a false statement causing *per se* damages to HACKMAN's reputation in the community *via* the sellers and the purchasers, all of whom were long time residents of the area.

107.    In addition, at all relevant times, and continuing through the present, agents and/or employees from DICKERSON, WHITEHEAD, COLDWELL, PRUDENTIAL and McKISKI have made derogatory and defamatory statements about HACKMAN, regarding HACKMAN's personal and business integrity, to HACKMAN's clients, agents and other third parties.

108.    As a proximate result of the false and derogatory statements by DICKERSON's agents and/or employees, namely REAVIS and SHELEY, PRUDENTIAL by and through LICARY, WHITEHEAD, COLDWELL and McKISKI, through which statements constitute slander *per se*, HACKMAN lost producing agents, as well as clients and commissions, and has been damages in an amount to exceed FIVE HUNDRED THOUSAND DOLLARS ($500,000.00).

WHEREFORE, the Plaintiffs, GREGORY HACKMAN d/b/a GREGORY HACKMAN REALTORS, and GREGORY HACKMAN REALTORS, INC., an Illinois corporation, request this honorable court enter judgment in their favor and against the Defendants, DICKERSON

REALTORS, INC., an Illinois corporation d/b/a DICKERSON-NIEMAN REALTORS, LORI

REAVIS, FRANK SHELEY, R. CROSBY, INCORPORATED, an Illinois corporation, d/b/a

PRUDENTIAL CROSBY REALTORS and JESSICA LICARY, WHITEHEAD, INC., an

Illinois corporation, d/b/a WHITEHEAD REALTORS, PREMIER REAL ESTATE

BROKERAGE SERVICES, INC., an Illinois corporation, d/b/a COLDWELL BANKER

PREMIER and McKISKI-LEWIS, INC., an Illinois corporation, d/b/a TOM McKISKI

REALTORS and LARRY PETRY, in an amount to exceed FIVE HUNDRED THOUSAND

DOLLARS ($500,000.00), plus a recoupment of all costs expended in prosecuting this action,

and any and all further relief as this court deems appropriate, including punitive damages.

### COUNT VI - TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY AGAINST DICKERSON, WEHRSTEIN, DUNN, WESTIN, REAVIS, SMITH, YOUNG, SHELEY, WHITEHEAD COLDWELL, PRUDENTIAL, LICARY, McKISKI, PETRY, RAAR and HALL

109.     HACKMAN incorporates and realleges Paragraphs 1 through 60 above, as if fully

restated herein.

110.     In April, 2002, Vickie Stearns, a former HACKMAN agent, lost a client when

derogatory statements about HACKMAN's business integrity and honesty were made by agents

of DICKERSON to said client in DICKERSON's main office area.

111.     In or about January, 2003, a HACKMAN agent, Donna Wingert, had a false

ethics complaint filed against her which was solicited by an agent of COLDWELL and/or HALL

and RAAR, whose motivation was to coerce Wingert to release her seller clients, Charlene and

David Stowe.  RAAR improperly turned the ethics matter over to IAR, who dropped it.  Wingert

eventually quit HACKMAN's employ, due to the treatment of HACKMAN by the Defendants.

112.     In October, 2003, one of HACKMAN's realtors, Syvaly Sengsouvanh, quit, for reason in part, after Melissa Smith of DICKERSON boycotted HACKMAN, and refused to set up a showing with said former HACKMAN realtor.

113.     Also in 2003, PETRY of McKISKI intentionally interfered with the Contract between HACKMAN and the Ruizes, despite knowing of said Contract, by refusing to present an offer to his clients if it came from HACKMAN.  PETRY made the Ruizes come to him directly to present the offer, thus cutting HACKMAN out.

114.     On September 19, 2003, HACKMAN entered into an employment agreement with Jeff DeWitt.  Shortly thereafter, DeWitt wrote a buyer's contract for a DICKERSON listed property.  DeWitt went to DICKERSON to present the offer and was called into the office of WESTIN, who said "you seem to be a smart guy, why are you working for HACKMAN?"  She then said other false and derogatory statements regarding HACKMAN's business integrity and acumen.  WESTIN had no business reason to even speak to DeWitt that day, and the sole purpose of WESTIN making these comments was to convince DeWitt to quit HACKMAN's employ.  These comments were a significant part of the reason DeWitt eventually quit HACKMAN.

115.     A few days later, REAVIS of DICKERSON stole a client, Greg Willis, from DeWitt.  When a commission dispute arose over this between HACKMAN and DICKERSON, REAVIS filed an ethics complaint against HACKMAN.  That matter is still pending, and is the subject of Counts III and IV of this suit.

116.     DeWitt eventually quit HACKMAN as a result of the above-described actions, costing HACKMAN the funds expended to educate and mentor DeWitt, as well as the commissions DeWitt would have reasonably brought to HACKMAN.

117.    On March 6, 2004, DUNN of DICKERSON ordered all DICKERSON offices (except one he could not reach) that HACKMAN agents were boycotted from setting up showings of any DICKERSON-listed properties.  On March 8, 2004, HACKMAN made telephone calls to five DICKERSON offices to set up showings for HACKMAN's clients.  The six people to whom HACKMAN spoke all refused to set up showings for HACKMAN.  HACKMAN was told by receptionists at all but one DICKERSON office in town that DUNN had given orders that none of HACKMAN's realtors, including Greg Hackman himself, could show a DICKERSON listed property.  This blatant boycott interfered with HACKMAN's client relationships and relationships with its agents, many of whom quit HACKMAN's employ shortly following this blatant boycott.

118.    In March, 2004, HALL advised WEHRSTEIN of DICKERSON to send the aforementioned 1% commission letter.  This improper and anticompetitive letter caused HACKMAN's agents, in part, to quit HACKMAN's employ.

119.    In May, 2004, YOUNG made false and derogatory statements to one of HACKMAN's clients, Don Sandell, falsely impugning HACKMAN's business integrity and honesty.  The client signed with YOUNG, who received a commission from a client he should never have had in the first place.

120.    On January 20, 2005, HACKMAN entered into a Listing Contract with Jeffrey and Kathleen Reimer, for the property commonly known as 10111 Joy Court in Roscoe.  REAVIS had also tried to get the Reimers to sign up.  Two days before the Listing Contract expired, the sellers refused to allow HACKMAN to set up a second showing for the agent of a potential buyer, saying HACKMAN would have to talk to REAVIS of DICKERSON.  Due to slanderous and derogatory statements about HACKMAN's business integrity made by REAVIS,

HACKMAN was denied the second showing, and lost the listing after it expired. Instead, the Reimers signed with REAVIS.

121. On May 10, 2005, HACKMAN signed a Listing Contract with Phyllis Ripko, to sell her property at 2629 Hanson Street in Rockford. The Contract was valid until February 10, 2006. On May 27, 2005, Jon Gates of PRUDENTIAL presented HACKMAN with an offer to purchase the property for $56,900.00. Gates presented the offer on behalf of Turned Around Properties, which was owned by Joseph Gates, the father of Jon Gates. Due to the illegibility of the original offer due to changes and facsimiles, a second offer for the same amount was presented on June 2, 2005, and the Sales Contract was signed by both parties. When an expected request for extension was not received by HACKMAN, and a call was placed to Gates about it, HACKMAN learned PRUDENTIAL, by and through LICARY, had told Gates, who related the information to his father/client, the false information that HACKMAN was dishonest and not to go through with the deal. LICARY, who had previously worked at RAAR, knew of the dissemination of false information against HACKMAN, and also knew of the vendetta and boycott against HACKMAN. LICARY's purpose in deliberately stating this false information and disparaging slander *per se* on HACKMAN's business integrity and competency was to convince Gates and his client not to consummate the contract with HACKMAN and his clients. As a result of LICARY's deliberate dissemination of the false information to Gates, HACKMAN lost the sale and the client.

122. Also in 2005, HACKMAN had a signed Listing Contract from Cassandra Woodman, and was waiting for a signature from the property's co-owner, Greg Smith. That night, PETRY of McKISKI intentionally interfered with the contract between HACKMAN and

Woodman by convincing Woodman to break the binding contract between her and HACKMAN, and stole the client from HACKMAN.

123.     In March 2006, HACKMAN attempted to re-list the property commonly known as 7371 Countryshire.  The sellers refused to re-list with HACKMAN, citing derogatory statements made to them by certain agents of the Defendants.

124.     On or about March 20, 2006, SHELEY of DICKERSON presented HACKMAN's (through Gregory Hackman) client's offer to purchase to Sheley's seller clients, Richard and Lori Bastian.  HACKMAN was told to wait in his car.  When Sheley came out he stated the offer was rejected and refused to present a counteroffer, which is common practice.  Only after HACKMAN insisted did SHELEY go back and obtain a counteroffer.  Eventually a deal was reached.  At the closing, SHELEY told HACKMAN's agent that SHELEY told his clients not to accept Hackman's offer because "HACKMAN's deals never close."  This was a false statement causing *per se* damages to HACKMAN's reputation in the community *via* the sellers and the purchasers, all of whom were long time residents of the area.

125.     HACKMAN had valid business relationships, and the expectancy of the completion of those relationships, with its clients as described above, by virtue of the respective Exclusive Listing Agreements.

126.     HACKMAN also had valid business relationships, and the expectancy of the completion of those relationships, with its agents, on whom HACKMAN spent much time and money training and mentoring.

127.     The Defendants, individually or by and through their employees and/or agents, and as individuals, knew HACKMAN had said business relationships with the above-referenced clients.

128.     The Defendants, individually or by and through their employees and/or agents, and as individuals, knew HACKMAN had said business relationships with the above-referenced agents.

129.     The Defendants, individually or by and through their agents and/or employees, and as individuals, intentionally interfered with said business relationships by ingratiating themselves with said clients, making derogatory statements about HACKMAN until the client left HACKMAN and went to the Defendants' offices, and soliciting false ethics complaints against HACKMAN to coerce HACKMAN to release the clients from their otherwise binding Listing Contracts.

130.     The Defendants, individually or by and through their agents and/or employees, and as individuals, also intentionally interfered with said business relationships by making derogatory statements about HACKMAN to its agents, and refusing to do business with these agents so long as they continued to work for HACKMAN, until the agents quit HACKMAN's employ.

131.     As a proximate result of the intentional interference with said client and agents relationships, HACKMAN lost commissions and other income.

132.     As a proximate result of the Defendant's intentional interference with HACKMAN's economic relationships with its clients and agents, HACKMAN has been damaged in an amount to exceed FIVE HUNDRED THOUSAND DOLLARS ($500,000.00).

WHEREFORE, the Plaintiffs, GREGORY HACKMAN d/b/a GREGORY HACKMAN REALTORS, and GREGORY HACKMAN REALTORS, INC., request judgment in their favor and against the Defendants, DICKERSON REALTORS, INC., an Illinois corporation d/b/a DICKERSON-NIEMAN REALTORS, FRANK WEHRSTEIN, MICHAEL DUNN, MARY

WESTIN, LORI REAVIS, FRANK SHELEY, RAY YOUNG, MELISSA SMITH,

WHITEHEAD, INC., an Illinois corporation, d/b/a WHITEHEAD REALTORS, PREMIER

REAL ESTATE BROKERAGE SERVICES, INC., an Illinois corporation, d/b/a COLDWELL

BANKER PREMIER, R.CROSBY, INCORPORATED, an Illinois corporation, d/b/a

PRUDENTIAL CROSBY REALTORS, JESSICA LICARY, McKISKI-LEWIS, INC., an

Illinois corporation, d/b/a TOM McKISKI REALTORS, LARRY PETRY,  ROCKFORD

ASSOCIATION OF REALTORS and TERRI HALL, in an amount to exceed $500,000.00, plus

the costs of prosecuting this action, as well as any and all further relief as this court deems

appropriate.


## PLAINTIFFS DEMAND TRIAL BY JURY


                                   /s/ David G. Sigale, Esq.
                                   Attorney for Plaintiffs


David G. Sigale, Esq. (#6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
319 North Weber Road, PMB #250
Bolingbrook, IL 60490
(630) 452-4547

## VERIFICATION BY CERTIFICATION

Under penalties as provided by law pursuant to Rule 11 of the Federal Rules of Civil Procedure, the undersigned, Gregory Hackman, individually and as authorized representative of Gregory Hackman Realtors, Inc., certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certify as aforesaid that thy verily believe the same to be true.

    /s/ Gregory Hackman
Gregory Hackman, individually and
Authorized representative of
Gregory Hackman Realtors and
Gregory Hackman Realtors, Inc.

David G. Sigale, Esq. (#6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
319 North Weber Road, PMB #250
Bolingbrook, IL 60490
(630) 452-4547