IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **GREGORY HACKMAN d/b/a GREGORY HACKMAN RELATORS,** and **GREGORY HACKMAN REALTORS, INC.,** an Illinois corporation | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | No. 06 C 50240 |
| **DICKERSON REALTORS, INC.,** an Illinois corporation **d/b/a DICKERSON-NEIMAN REALTORS, WHITEHEAD, INC.,** an Illinois corporation **d/b/a WHITEHEAD REALTORS, R. CROSBY, INCORPORATED,** an Illinois corporation **d/b/a PRUDENTIAL CROSBY REALTORS, McKISKI-LEWIS, INC.,** an Illinois corporation **d/b/a TOM McKISKI REALTORS, LORI REAVIS, RAY YOUNG, MICHAEL DUNN, MELISSA SMITH, JESSICA LICARY, DIANE PARVIN, FRANK WEHRSTEIN, FRANK SHELEY, MARY WESTIN, LARRY PETRY, ROCKFORD AREA ASSOCIATION OF REALTORS, TERRI HALL,** and **ILLINOIS ASSOCIATION OF REALTORS,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Gregory Hackman d/b/a Gregory Hackman Realtors and Gregory Hackman Realtors, Inc. (collectively "Hackman") filed a complaint on November 30, 2006 alleging generally that the defendants engaged in an anticompetitive conspiracy to drive Hackman out of the Rockford, Illinois real estate market. On August 31, 2007, I issued an order addressing motions filed by

various defendants.  *Hackman v. Dickerson Realtors, Inc.*, 520
F.Supp. 2d 954 (N.D. Ill. 2007).  Plaintiffs have since filed an
amended complaint in response to that Order and to other
developments in the case.

Now before me are the following motions: a joint motion by
defendants R. Crosby, Inc., d/b/a Prudential Crosby Realtors
("Prudential") and Jessica Licary to dismiss Counts I and II; a
joint motion by defendants Rockford Association of Realtors
("RAAR") and Illinois Association of Realtors (IAR) to dismiss
Counts I-IV and VI; a motion by defendant Terrie[1] Hall to dismiss
Counts I, II and VI; motions by defendant Frank Sheley to dismiss
Counts I, II, V and VI; and a motion by defendant Mary Westin to
dismiss Counts I, II and VI. I resolve these motions as set forth
below.[2]

I.

The thrust of Hackman's amended complaint is unchanged from
its original iteration.  The counts are the same as in the original
complaint, though additional parties have been added.  Counts I and
II allege antitrust violations against defendants Dickerson,

---

[1]Plaintiffs' spelling is "Terri" Hall, but I use "Terrie," the
spelling most often used in Hall's own pleadings.

[2]I assume familiarity with my prior Order and limit my factual
summary to an identification of the present counts and the parties
against which they are asserted.  Within my discussion of each
motion, I summarize relevant procedural history and address any
pertinent new material in the amended complaint.

Wehrstein, Dunn, Westin, Reavis, Sheley, Young, Whitehead, Prudential, Licary, McKiski, Petry, Parvin, RAAR and Hall, under the Sherman Act, 15 U.S.C. §§1 & 2, and the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1, *et seq.*, respectively. Count III is materially unchanged from the original complaint and seeks a temporary injunction against RAAR and IAR to stop an ethics hearing against Hackman. Count IV is also substantially unchanged and seeks a declaration of rights and a permanent injunction against RAAR and IAR concerning the same ethics proceedings. Count V alleges defamation against Dickerson, Reavis, Prudential, Licary, Whitehead, and McKiski. Count VI alleges tortious interference with business expectancy against Dickerson, Wehrstein, Dunn, Westin, Reavis, Smith, Young, Sheley, Whitehead, Prudential, Licary, McKiski, Petry, RAAR and Hall.

## II. Prudential and Licary's Motion to Dismiss

Defendants Prudential and Licary move to dismiss Counts I and II of the amended complaint. These defendants previously brought a motion to dismiss Counts I, II, V and VI of the original complaint. In my Order of August 31, 2007, I granted their motion in part, dismissing Counts I and II (which were not then asserted against Licary individually).[3] I dismissed those counts because

---

[3]I also granted their motion as to Count VI but denied their motion as to Count V. In the amended complaint, plaintiffs reassert Counts I, II, V and VI against Prudential and Licary. Prudential and Licary have now answered amended Counts V and VI.

the allegations in the original complaint did not plead sufficient factual material to state an antitrust claim against these defendants.

In the amended complaint, plaintiffs reassert Counts I and II, this time against Licary individually, as well as against Prudential and others. Prudential and Licary again seek dismissal. Because I find that plaintiffs have now adequately pled a claim for antitrust violations against these defendants, I deny their motion.

In my August 31, 2007 Order, I found that as to Prudential and Licary that complaint failed to allege, as it must under the pleading standard of *Bell Atlantic v. Twombley*, 127 S.Ct. 1955, 1965 (2007), "enough factual matter (taken as true) to suggest that an agreement was made." *Hackman*, at 968 (*quoting Bell Atlantic*). The amended complaint, however, alleges factual matter pertaining to these defendants that is sufficient to "raise a right to relief above the speculative level." *Bell Atlantic*, at 1965. For example, the amended complaint alleges that RAAR hosted a meeting at its headquarters in 2004, and that the agency defendants, presumably including Prudential, agreed at that meeting not to do business with plaintiffs. (Am. Compl. ¶ 36)

The amended complaint also refers to a specific statement allegedly made in January 2000 by a representative of one of the defendant agencies. (Am. Compl. ¶ 30) Plaintiffs allege that the representative told a Hackman agent that the defendant agencies,

4

presumably including Prudential, were "participating in a boycott" against Hackman as a result of his commission rate. Although these allegations do not identify Prudential by name, it is reasonable to infer that plaintiffs intended to include Prudential, and I must draw all reasonable inferences in favor of plaintiffs. These allegations are sufficient to establish, at the pleading stage, the existence of an agreement among the agency defendants and participation in that agreement by Prudential.

The sufficiency of Counts I and II against Licary is a closer call. The amended complaint does not allege that Licary was present at the 2004 RAAR meeting or that she had explicitly agreed to the agency boycott. Nevertheless, plaintiffs assert that she was aware of the "vendetta" against Hackman, and they identify a specific act (making a knowingly false statement about Hackman in order to undermine his deal) that she allegedly undertook in furtherance of the agencies' agreement. (Am. Compl. ¶ 43) As discussed further below, I find that in context these allegations are adequate to state a claim against Licary as well.

The amended complaint identifies two concrete settings in which the alleged agency agreement was discussed, and, as to Licary, alleges her knowledge of the conspiracy and an overt act by her that can reasonably be construed as indicating her agreement with it. This is sufficient to give both defendants fair notice of

the grounds on which Counts I and II against them rest. *Bell Atlantic* requires no more. *Bell Atlantic*, at 164.

Prudential and Licary argue that the defects in the allegations against them have not been cured in the amended complaint and are still insufficient under *Bell Atlantic*. I disagree. As the Seventh Circuit recently instructed, *Bell Atlantic* "must not be overread." *Limestone Development Corp. v. Village of Lemont*, 520 F.3d 797, 803 (2008). *Bell Atlantic* does not require "heightened fact pleading of specifics." *Bell Atlantic* at 1974. As the Seventh Circuit recently explained in *Limestone Development,* the *Bell Atlantic* decision reflects the concern that allowing big, complex cases to proceed based on "threadbare" claims may force defendants to settle even largely groundless claims because of their "in terrorem" effect. *Limestone Development,* at 803. That concern does not militate in favor of dismissal here.

The present case, like *Bell Atlantic,* includes federal antitrust claims. The similarity between the cases ends there. *Bell Atlantic* was a class action lawsuit of mammoth proportions: plaintiffs represented a putative class of "at least 90 percent of all subscribers to local telephone or high-speed internet access in the continental United States," while defendants were the nation's largest telecommunications companies with thousands of employees generating "reams and gigabytes of business records." *Id.*, at 1967. The potential scope of discovery in that case clearly

warranted the Court's close scrutiny of the bare-bones allegations in the complaint.

Here, by contrast, plaintiffs are two local realty concerns, both owned by the same individual sole proprietor, and defendants are a handful of local businesses, professional associations, and their agents. More importantly, the claims at issue have been fleshed out beyond the previously "threadbare" assertions of an agreement. While discovery will certainly result in some burden and expense to Prudential and Licary (as it will to all defendants), that is true in every case. Moreover, considering that both defendants have answered Counts V and VII, on which discovery will presumably proceed and likely overlap with the discovery relevant to Counts I and II, the incremental expense to them of defending against these counts is an insufficient reason to dismiss plaintiffs' properly stated claims.

It is true that plaintiffs' inartful allegation of Licary's agreement with the agencies' conspiracy leaves room to dispute the sufficiency of the antitrust claims against her. Based on the factual context, however, I interpret the assertions that she was aware of the agency "vendetta" against Hackman and that she took specific action in furtherance of it as allegations of more than mere parallel conduct. In context, I understand these statements as allegations of Licary's tacit agreement with the alleged conspiracy, or, in the terms of the applicable standard, as

allegations that she "had a conscious commitment to a common scheme." *Monsanto v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984). Accordingly, they are sufficient to state an antitrust claim against her.[4]

Prudential and Licary's arguments for dismissal are unpersuasive. They do not dispute that the conduct complained of is actionable if it was undertaken by agreement among the defendants. They claim, however, that the new material in the amended complaint is insufficient to establish their agreement because it relates only to the ethics complaint in which they were not involved. This is a disingenuous reading of the amended complaint. Prudential and Licary generally ignore the allegations discussed above, which clearly relate to an agreement by these defendants to "boycott" Hackman, not to the ethics complaint.

For the foregoing reasons, I deny Prudential and Licary's motion to dismiss Counts I and II.

### III. RAAR and IAR's Joint Motion to Dismiss:

RAAR and IAR move to dismiss Counts I-IV and Count VI of the amended complaint. These defendants previously moved to dismiss

---

[4]*Bell Atlantic* reaffirmed the proposition that parallel conduct does not alone amount to a violation of the Sherman Act, reiterating that an agreement is necessary. The anticompetitive agreement need not, however, be explicit, and parallel business behavior may be circumstancial evidence of a tacit agreement that violates the Sherman Act. *Bell Atlantic*, at 1964 (*citing Theater Enterprises, Inc., v. Paramount Film Distributing Corp*., 346 U.S. 537, 540 (1954).

Counts I and II under Rule 12(b)(6) and Counts III and IV under
Rule 12(b)(1).[5]  I granted their motion as to Counts I and II based
on my finding that plaintiffs had not properly alleged any
agreement between these and any other defendants.  I further
granted their motion as to Counts III and IV based on lack of
subject matter jurisdiction.

In the present motion, RAAR and IAR first argue that all
counts against them should be dismissed because plaintiffs were not
entitled to amend their complaint as to RAAR and IAR.  They then
reiterate their earlier arguments that plaintiffs have not
sufficiently alleged an agreement by RAAR or IAR to state a claim
under federal or state antitrust laws, and that I do not have
supplemental jurisdiction over plaintiffs' claims for injunctive
and declarative relief.  Finally, defendants argue that because
plaintiffs' allegations in support of their claim for tortious
interference with business expectancy are overly vague, conclusory,
and lacking in detail, they fail to state a claim.

I disagree with RAAR and IAR that plaintiffs were required to
seek leave to file their amended complaint, and I decline to grant
their motion on that ground.  Instead, I grant the motion as to
Counts I-IV because the amended complaint fails to overcome the
defects I noted in my Order of August 31, 2007, however.  I further

_____

[5]The original complaint did not assert Count VI against RAAR
and IAR.

9

grant RAAR and IAR's motion to dismiss Count VI for the reasons discussed below.

## A. Counts I-IV

The allegations in the amended complaint that concern RAAR and IAR are not substantially different from those in the original complaint, with a few exceptions that warrant discussion. The most significant new element is the alleged "one-percent letter." Plaintiffs assert that in response to a complaint from defendant Frank Wehrstein about plaintiffs' five percent commission rate, RAAR President Terrie Hall advised Wehrstein to send a letter to Hackman threatening to reduce Hackman's portion of the commission in any transaction between Hackman and Dickerson. (Am. Compl. ¶ 40) According to the amended complaint, Hall counseled Wehrstein to send Hackman a letter "that would reduce Hackman's commission rate" on any Dickerson property to one percent, regardless of the commission split "posted" for that property. In other words, instead of receiving the commission offered generally to buyers' agents (which Hackman states is usually half of the total[6]), Hackman would receive only one percent on the sale of any Dickerson-listed property.

---

[6]Plaintiff asserts that the "going" commission is six or seven percent, except on his own listings.

Plaintiffs also assert that Hall, acting as an agent of RAAR,[7] "solicited" false ethics complaints against Hackman, and that RAAR and IAR handled these and other complaints in a way that violated the associations' internal rules. (Am. Compl. ¶¶ 50-56) Finally, plaintiffs allege that "someone" at RAAR disabled a Hackman agent's computer access in furtherance of defendants' anticompetitive scheme, which contributed to that agent's decision to quit Hackman's employ. (Am. Compl. ¶ 42)

In my Order of August 31, 2007, I explained that because the basis for plaintiffs' antitrust claims against RAAR was that RAAR had "encouraged" the other defendants' group boycott, their claim was legally insufficient: "encouragement absent agreement is not enough" to state an antitrust claim under *Bell Atlantic*. *Hackman*, at 965. Although plaintiffs have now characterized RAAR's involvement in the alleged boycott as encompassing "agreement, support and assistance," I find that the factual material contained in the amended complaint does not support plaintiffs' characterization. Looking beyond plaintiffs' "labels and conclusions," which are insufficient to state a plausible claim for relief, *Bell Atlantic* at 1959, I again conclude that plaintiffs

---

[7]The allegations attributing specific acts or omissions to defendant Hall are sometimes, but not always, accompanied by allegations that Hall was acting as an agent of RAAR. There is apparently no dispute, however, that Hall was acting in her capacity as RAAR present with respect to the facts alleged, so for the purposes of RAAR's motion, I assume that all acts attributed to Hall may properly be imputed to RAAR.

fail to allege facts from which it could be inferred that RAAR reached an anticompetitive agreement with the other defendants. That is, I do not find, based on the allegations, that any agent acting on behalf of RAAR is alleged to have "had a conscious commitment to a common scheme designed to achieve an unlawful objective" as required under *Monsanto v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984).

With respect to the "one-percent letter," plaintiffs do not allege, or suggest facts sufficient to infer, that Terrie Hall was aware of the alleged agency boycott. Nor do they claim that she was aware of any of the specific acts they assert were in furtherance of the conspiracy. Accordingly, to the extent their allegations can reasonably be understood as asserting RAAR's violation of Section 1 of the Sherman Act on the theory that Hall participated in the agencies' horizontal boycott, their claim remains legally insufficient.

To the extent plaintiffs' allegations can be interpreted as a claim that the one-percent letter amounted to an unlawful attempt by Dickerson to exercise monopoly power in violation of Section 2 of the Sherman Act, their allegations against Hall (as an agent of RAAR) could be understood as asserting a claim for conspiracy to monopolize. Under that theory of liability, Hall's awareness of the group boycott is presumably immaterial. Nevertheless, plaintiffs' claim fails based on an attempt to monopolize/conspiracy to

monopolize theory because plaintiffs do not allege sufficient facts from which to infer that any of Dickerson, Hall, or RAAR had an "intent and purpose" to exercise monopoly power.[8] *American Tobacco Co. V. United States*, 328 U.S. 781, 809 (1946).

On its face, the amended complaint pleads only that Hall received a complaint from Wehrstein about the commission structure Hackman offered and suggested that Wehrstein reduce Hackman's commission on Dickerson listings in return.[9] Plaintiffs do not allege that Hall advised Wehrstein to recruit any other agency to participate in the one-percent plan, or that her suggestion was intended to promote a monopoly. While one could conceive of a factual context in which Hall's actions might be actionable, plaintiffs' allegations fail to "raise a right to relief above the speculative level." *Bell Atlantic* at 1965.

Plaintiffs' remaining allegations against RAAR even more clearly fail to state an antitrust claim and merit little

---

[8] I note that nowhere do plaintiffs' allege that Dickerson (or any other defendant) exercised, attempted to exercise, or conspired to exercise monopoly power. The interpretation that the amended asserts a Sherman Section 2 claim is based on a particularly generous reading of plaintiffs' allegations. Because I find that plaintiffs' presumed Section 2 claim is insufficient at least for the reason stated above, I need not address whether plaintiffs have otherwise provided fair notice under Fed. R. Civ. P. 8(a) of a Section 2 claim.

[9] Plaintiffs allege that Section 5 of the MLS Rules—which are not attached to the complaint—governs the commission "split." Whether and against whom plaintiffs may have a claim pursuant to those rules based on the facts alleged in the amended complaint is an issue for another day.

consideration.  The allegation that "someone from the RAAR office" sabotaged Hackman agent Donna Wingert's computer is overly vague and plainly speculative, and it does establish a basis for concluding that the RAAR participated in an anticompetitive agreement.

In response to my previous finding that none of plaintiffs' allegations would connect RAAR and IAR's treatment of ethics complaints to the alleged anticompetitive scheme, *Hackman*, at 967, plaintiffs have tried to link RAAR's handling of ethics complaints to the alleged anticompetitive conspiracy.  Their allegations are insufficient, however, and their arguments unpersuasive.

The allegation that RAAR and Hall "solicited" false ethics complaints against Hackman fails to state an antitrust claim. As RAAR and IAR point out, plaintiffs allege that disgruntled Hackman clients contacted Hall, not that she contacted them.  Regardless of whether the referrals to Hall were prompted by unlawful action by other defendants, nothing in plaintiffs' allegations suggests that Hall or RAAR sought out these contacts as part of an anticompetitive scheme.  The allegation that Hall mishandled calls might state a claim against RAAR under applicable professional standards; but it does not suffice to establish that RAAR participated in an anticompetitive agreement.

Moreover, once ethics complaints against Hackman had been filed, RAAR arguably acted prudently and appropriately under the

circumstances by removing those proceedings to the IAR.[10]  If indeed the local real estate climate is as hostile to Hackman as plaintiffs assert, then it would seem that Hackman could only benefit from having the proceedings conducted elsewhere.  Plaintiffs' argument that RAAR's transfer of complaints against Hackman to IAR supports their claim that RAAR was involved in an anticompetitive scheme is therefore rather mystifying.

Likewise, the allegations that RAAR treated complaints brought *by* plaintiffs differently from how it treated complaints brought *against* them conceivably states a violation of RAAR bylaws or other internal regulations; but it does not state an antitrust claim.  Even assuming RAAR's conduct in this regard was improper, plaintiffs have not pled any substantive basis for concluding that it was the result of an anticompetitive agreement.  Naked allegations do not suffice.

In sum, plaintiffs' amended complaint fails to state an antitrust claim against RAAR for the same reasons the original complaint failed.  As I noted in my August 31, 2007 Order, the insufficiencies in plaintiffs' Sherman Act claims also doom their claims under the Illinois Antitrust Act.  *Dickerson*, at 966.

---

[10]Because I decline to exercise jurisdiction over Counts III and IV, the ultimate propriety of RAAR and IAR's actions must be determined by a competent authority.  I must, nonetheless, decide whether the alleged conduct by RAAR logically supports the conclusion that RAAR participated in an illegal agreement to restrain trade.  For the reasons stated, I find based that it does not.

B. Count VI

As an initial matter, I note that in my Order of August 31, 2007, I ordered plaintiffs to file an amended complaint that more clearly stated the separate claims against the various defendants identified Counts V and VI.  Plaintiffs failed to do so.  Instead, they added additional defendants and factual material to the existing counts, rendering them even more difficult to follow. Nonetheless, it is clear that plaintiffs fail to state a claim for tortious interference with prospective economic advantage against RAAR.[11] I grant RAAR and IAR's motion as to Count VI.

As I earlier held, establishing a claim for tortious interference with prospective economic advantage requires that plaintiffs show (1) their reasonable expectation of entering into a valid business relationship; (2) defendants' knowledge of that expectancy; (3) purposeful interference by the defendants preventing that expectancy from being fulfilled; and (4) damages resulting from such interference. *Hackman*, at 970-71 (citing *Burrell v. City of Mattoon*, 378 F.3d 642, 652 (7th Cir.2004).  The allegations directed to RAAR that can reasonably be understood as supporting a claim for tortious interference are (1) the allegations regarding the one-percent letter; (2) the allegations that RAAR or its agents

---

[11]As I noted previously, although plaintiffs style Count VI as a claim for tortious interference with business expectancy, their claims are properly analyzed as claims for tortious interference with prospective economic advantage.  *Hackman*, at 970.

solicited false ethics complaints; and (3) the allegation that "someone" from the RAAR disabled a Hackman agent's "Supra Key." As discussed below, none of these allegations suffices to state a claim for tortious interference.

The allegations regarding the "one-percent" letter fail to state a claim for tortious interference because plaintiffs do not identify any deal that was not consummated as a result of the one-percent letter, or establish that any business expectancy with either clients or agents was not fulfilled as a result of the letter. Although plaintiffs state that the one-percent letter "in-part" caused unidentified agents to quit Hackman's employ, that allegation is too vague to state a viable claim. Moreover, the tort of intentional interference with prospective economic advantage requires some conduct "directed toward a third party through which defendants purposely cause that third party not to enter into or continue" a relationship with the plaintiff. *McIntosh v. Magna Systems, Inc.*, 539 F.Supp. 1185 (N.D. Ill. 1982)(tortious conduct directed toward plaintiff does not support claim for tortious interference with business opportunities). Because the "one-percent" letter was allegedly sent to plaintiffs and not to any third party, it does not support plaintiffs' claim for tortious interference.

The allegations regarding ethics complaints may be understood as asserting a tortious interference claim under two distinct

theories. Plaintiffs first allege, at paragraph 50, that Hall encouraged unidentified clients seeking release from their contracts with Hackman to file ethics complaints against him. This statement may reasonably be interpreted as an allegation that RAAR (through Hall) interfered with Hackman's contractual relations with his clients.[12] Plaintiffs also allege, in paragraph 111, that Hall/RAAR encouraged certain clients of Hackman's agent, Donna Wingert, to file a false complaint against Wingert, and that Wingert later left Hackman's employ.[13] Those statements may reasonably be interpreted as an allegation that RAAR interfered with Hackman's expectation of Wingert's continued employment. Under either theory, plaintiffs' claim fails.

First, the complaint leaves me guessing whether the paragraphs referenced above refer to the same event or to two separate events. Thus, it is unclear whether any ethics complaint was ever filed pursuant to the event described in paragraph 50. It is also unclear from that paragraph whether any client contract was ever breached. Meanwhile, although a reasonable inference from the allegations in

_____

[12]This theory, in reality, is a claim for tortious interference with *contract*. That plaintiffs' styled their claim as one for tortious interference with business expectancy is not a basis for dismissal, however, provided the allegations are sufficient to state a claim for liability under some theory.

[13]Plaintiffs allege that "an agent of COLDWELL and/or HALL and RAAR" solicited that complaint. Mindful that I must draw all reasonable inference in favor of the non-movant, I interpret this allegation as attributing conduct to RAAR.

paragraph 111 is that an ethics complaint was actually filed, it is still unclear whether Hackman's contract with the named clients was breached. For these reasons, the allegations that RAAR solicited false ethics complaints fails to state a claim for tortious inference with contract. *International Marketing, Ltd. v. Archer-Daniels-Midland Company, Inc.*, 192 F.3d 724, 731-32 (7th Cir. 1999) (interference with contract claim fails under Rule 8 where no breach alleged).

While plaintiffs arguably come closer to stating a claim under the second theory, their allegations are simply too muddled, and the asserted nexus between RAAR's conduct and Wingert's ultimate departure from Hackman's employ too attenuated, to state their claim adequately. The allegations do not assert that Wingert quit "as a result of" RAAR's alleged interference. Instead, they state that Wingert "eventually" quit due to the general treatment of Hackman by all of the defendants collectively. Such a generic allegation falls short of establishing the causation required for a claim for tortious interference with an existing business relationship.

Finally, the allegation that "someone" from the RAAR office disabled Donna Wingert's "Supra Key," and that that event "contributed" to Wingert's departure from Hackman's employ is

similarly too attenuated, as well as too speculative and vague to state a "plausible entitlement to relief." *Bell Atlantic*, at 1967.[14]

In sum, plaintiffs have not facts sufficient to infer that the conduct attributed to RAAR amounts to either tortious interference with contract or with prospective business relations.

For the foregoing reasons, I grant RAAR and IAR's motion to dismiss Count VI.

### IV. Hall Motion to Dismiss

At times relevant to this action, Terrie Hall was President of RAAR. Plaintiffs first named Hall as a defendant in their amended complaint. They assert Counts I, II and VI against her. Hall moves to dismiss all counts against her, and I grant the motion *in toto*.

As noted above, I assumed for the purpose of considering RAAR and IAR's joint motion that Hall was acting as an agent of RAAR with respect to all acts and omissions that plaintiffs' attribute to her. Accordingly, the majority of my analysis in Section III, *supra*, is also applicable to Hall's motion. Although Hall asserts several arguments not raised by RAAR/IAR, I need not address them because I find that Counts I, II and VI against Hall fail for at least the reasons they fail against RAAR, which are explained above.[15]

---

[14]Plaintiffs' assertion that the pleading standards articulated in *Bell Atlantic* are inapplicable to Count VI is without merit.

[15]Hall also argues that Hackman waived all claims against her pursuant to the National Association of Realtors' Code of Ethics and Arbitration Manual and that her actions were privileged as an officer of RAAR.

Nevertheless, Hall's argument with respect to the "one-percent letter" merits a brief discussion.

## A. Counts I and II

Hall attaches to her motion a portion of the Handbook on Multiple Listing Policy entitled "Division of Commissions Section 5" (which I presume is the text plaintiffs identify as Section 5 of the "MLS Rules").[16] Hall claims that the excerpted text explicitly authorizes agents to send letters such as the one-percent letter defendant Wehrstein allegedly sent to Hackman at Hall's behest. The text states that the listing broker "shall specify, on each listing filed with the Multiple Listing Service, the compensation offered to other Multiple Listing Service Participants for their services in the sale of such listing." Note 1 to that section further explains that "in filing a property with the Multiple Listing Service...the Participant of the Service is making blanket unilateral offers of compensation to the other MLS Participants."

A reasonable reading of the excerpts above is that listing brokers must offer the same commission to all potential buyer agents. But Note 1 continues:

> This shall not preclude the listing broker from
> offering any MLS Participant compensation other than
> the compensation indicated on any listing published
> by the MLS, *provided the listing broker informs the*

_____

[16]Under *Venture Associates v. Zenith Data Systems*, 987 F.2d 429, 431 (7th Cir. 1993) and *Wright v. Associated Ins. Companies, Inc*. 29 F.3d 1244, 1248 (7th Cir. 1994), I may consider this document without converting defendants' motions to Rule 56 motions.

> *other broker, in writing, in advance of producing an*
> *offer to purchase*, and *provided that the*
> *modification in the specified compensation is not*
> *the result of any agreement amount all or any other*
> *Participants in the Service*. (emphasis added)

It appears, then, that Wehrstein's one-percent letter was not only allowable, it was required. Furthermore, the Handbook expressly contemplates that a listing agent may offer "any MLS Participant" a commission other than the one otherwise published for a particular listing, consistent with her duty not to engage in concerted action.

The foregoing is relevant because it reinforces the conclusion that neither Wehrstein's letter nor Dickerson's one-percent commission can be taken as conduct that reasonably suggests the existence of an agreement. Indeed, the Manual explicity contemplates such conduct in the absence of concerted action.

For the forevoing reasons, in addition to those explained in Section III.A., *supra*, I grant Hall's motion as to Counts I and II.

## B. Count VI

Plaintiffs' allegations are insufficient to state a claim against Hall for tortious interference with contract or with prospective business opportunity. As discussed in Section III.B., *supra*, Hall's alleged involvement with the one-percent letter lacks a sufficient causal link with the injury claimed. Likewise, the allegations that Hall mishandled ethics complaints are insufficient because, also as discussed in Section III.B., they are too vague and conclusory to state a plausible claim for relief.

For the foregoing reasons, I grant Hall's motion as to Count VI.

## V. Sheley Motions to Dismiss

Plaintiffs named Frank Sheley as a defendant for the first time in their amended complaint, asserting Counts I, II, V and VI against him. Defendant Sheley moved to dismiss Counts I, II and VI pursuant to Fed. R. Civ. P. 12(b)(6). Sheley later moved to dismiss Count V[17] on the ground that it was barred by applicable statue of limitations, 735 ILCS 5/13-201. For the reasons discussed below, I grant Sheley's motion as to Counts I, II and VI and deny his motion as to Count V.

Defendant Sheley is an agent of defendant Dickerson. Only one paragraph of the amended complaint alleges specific conduct on Sheley's part (Am. Compl. ¶ 44). In that paragraph, plaintiffs recount two separate events relating to a transaction between seller clients of Sheley's and a buyer client of Hackman's. Plaintiffs first allege that Hackman's clients made an offer to purchase property owned by Sheley's clients, and that Sheley summarily rejected the offer rather than follow the common practice of presenting a counter offer. Plaintiffs state that they nonetheless received and accepted a counter offer, and the transaction

_____

[17] Because Sheley's name was omitted from the heading of Count V but included in the prayer for relief, there was some initial confusion as to whether Count V was asserted against Sheley. Once Sheley realized that he was named in Count V, he sought and obtained leave to file his untimely second motion.

proceeded.  At the closing, Sheley told the Hackman agent present that he had advised his clients not to go through with the deal because "HACKMAN'S deals never close." Nevertheless, the transaction was consummated.  Plaintiffs allege that Sheley's statement was false and that it was "intended to perpetuate the group boycott" against Hackman.

## A. Count V

I begin with an analysis of Count V (defamation), since Sheley's allegedly defamatory statement is at the core of all of the counts against him.  Plaintiffs assert that the statement "Hackman's deals never close" is false and constitutes defamation *per se*. Based on the allegations in the amended complaint, I agree.  Under Illinois law, "words that impute a person is unable to perform or lacks integrity in performing her or his employment duties" and "words that impute a person lacks ability or otherwise prejudices that person in her or his profession" are considered defamation *per se*.  *Solaia Technology, LLC v. Specialty Pub. Co.*, 221 Ill.2d 558, 580, 852 N.E. 2d 825 (2006).  The offending statement fits squarely into either of these categories.

Defendant Sheley does not dispute that the statement is *per se* defamatory but argues that it is time barred.  Plaintiffs acknowledge that the statement was made on April 28, 2006, and that the claim against Sheley was filed on October 23, 2007, more than one year later.  Plaintiffs argue that they are nevertheless

entitled to assert their claim because they did not know, nor should they have known, about the statement until December 23 or 24, 2006, so the statute of limitations did not begin running until then. Plaintiffs explain that the Hackman agent who heard the statement did not reveal it to Hackman until December of 2006. Defendant Sheley argues in reply that plaintiffs are deemed to have knowledge of the statement as of the time their agent heard it, so the period for filing their claim has expired.

Plaintiffs also argue that because the defamation claim against Sheley relates back to the original complaint, it was timely filed. Sheley disputes that the count against him relates back to the original complaint.

Defendants are correct that an agent's knowledge is imputed to the principal if the knowledge concerns a matter within the scope of the agent's authority and was acquired in the scope of the agent's duties. *Bryant v. Livigni*, 250 Ill.App.3d 303, 308, 619 N.E. 2d 550 (1993). But knowledge is imputed only where the agent has a duty to speak to the principal about the specific knowledge he or she has acquired. *Installation Services, Inc., v. Electronics Research, Inc.*, No. 04 C 6906, 2005 WL 3180129, at *3 (N.D. Ill, Nov. 23, 2005)(Kennelly, J.)(*quoting Evanston Bank v. Conticommodity Svcs., Inc.*, 623 F.Supp. 1014, 1035 (N.D. Ill. 1985).

In *Installation Services*, the defendants contended that the plaintiff's defamation claims were time barred under circumstances

similar to those alleged here.  The defendants argued on summary judgment that because the plaintiff's agent heard the offending statements more than two years before the plaintiff filed its claims and the plaintiff was deemed to have knowledge of them, the statute of limitations began running as of that time.  The court held that whether or not the agent had a duty to speak to the plaintiff about the statements in question was a factual question.  Accordingly, the court could not impute knowledge of the statements to the plaintiff as a matter of law and allowed the claim to proceed to trial.

Based on the reasoning in *Installation Services*, I do not find at this stage that plaintiffs' defamation claim against Sheley is time barred.  Accordingly, I need not address whether that claim relates back to the original complaint.

For the foregoing reasons, Sheley's motion as to Count V is denied.

## B. Counts I and II

As discussed at greater length in my Order of August 31, 2007 and in Section II above, antitrust claims fail where the factual matter set forth in the allegations is insufficient to establish a reasonable likelihood that an agreement was reached.  The allegations in the amended complaint directed to defendant Sheley fall into this category. Plaintiffs' conclusory assertion regarding Sheley's intent in making the allegedly defamatory statement, absent factual allegations to suggest Sheley knew about and agreed to

participate in the agency boycott, is without sufficient support to "raise a right to relief above the speculative level." *Bell Atlantic*, at 1965. Indeed, defendant Sheley rightly points out that the very facts pled—that a transaction was completed between Hackman's and Sheley's clients—suggest that Sheley had not agreed to refuse to deal with Hackman. Plaintiffs' blanket assertions of anticompetitive conduct by all defendants do not provide sufficient factual material to support their claim against defendant Sheley. For these reasons, I grant defendant Sheley's motion as to Counts I and II.

## C. Count VI

Plaintiffs' claim against Sheley for tortious interference is patently untenable. First, the only transaction in which Sheley was involved was consummated, and plaintiffs assert no basis on which to conclude that they suffered damages arising out of that transaction. As noted above and in my August 31, 2007 Order, actual damages is an element of a claim for tortious interference.[18] In addition, plaintiffs must show their reasonable expectation of entering into a valid business relationship; defendants' knowledge of that expectancy; and purposeful interference by the defendants

---

[18]While it is true that damages may be presumed in cases of per se defamation, plaintiffs' acknowledgement that the business deal in question was realized suggests that any presumptive damages in this case would be based other compensable injuries, such as harm to reputation, but not on actual losses arising from the only identified business expectancy.

that prevented that expectancy from being fulfilled. *Hackman*, at 970-71. Setting aside the business opportunity alleged in ¶ 44 (which cannot support their claim due to lack of damages), plaintiffs do not allege a single business expectancy with which Sheley interfered.

None of plaintiffs' cited authorities suggests any basis for overcoming this fundamental flaw. To the contrary, *Downers Grove Volkswagen v. Wigglesworth*, 190 Ill.App.3d 524, 529, 546 N.E. 2d 33 (1989) held that "[p]laintiff must plead facts to show interference of a business relationship with specific third parties or an identifiable prospective class of third persons." While the court noted that plaintiffs need not name specific third parties, *Id*, *citing Crinkley v. Dow Jones & Co.*, 67 Ill. App. 3d, 869, 878, 385 N.E.2d 714 (1978), they must, at a minimum, allege the existence of third parties. The *Downers Grove* court went on to hold that the plaintiff's allegations "that 80% of the people that bought Saabs from its dealership return for inspection services and that it expected to continue to provide service to its customers" were sufficient. *Downers Grove*, at 529. Plaintiffs' allegations as to Sheley fall short of even this modest degree of specificity.

For the foregoing reasons, I grant Sheley's motion as to Count VI.

## VI. Westin Motion to Dismiss

Plaintiffs named Mary Westin as a defendant for the first time in their amended complaint, asserting Counts I, II and VI against her. Defendant Westin moves to dismiss all claims against her pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons discussed below, I grant her motion as to Counts I, II and VI.

Defendant Westin is a real estate agent and manager of defendant Dickerson. Two paragraphs in the amended complaint allege specific conduct on Westin's part (Am. Compl. ¶¶ 34, 114). Plaintiffs assert that while Hackman agent Jeff DeWitt was at Dickerson's offices on business, defendant Westin called him into her office and said, "you seem to be a smart guy, why are you working for HACKMAN?" Westin then made unspecified derogatory remarks about Hackman to DeWitt. Plaintiffs allege that Westin had no business purpose for speaking to DeWitt that day, and that her only objectives were to perpetuate the agency boycott, to harm Hackman's business, and to convince DeWitt to quit Hackman's employ.

### A. Counts I and II

My analysis in Section V.B., *supra*, generally applies to plaintiffs' antitrust claims against defendant Westin. Plaintiffs do not allege sufficient factual matter to suggest with reasonable likelihood that Westin agreed with any other defendant to an anticompetitive scheme against Hackman. Plaintiffs' claim is

therefore insufficient under *Bell Atlantic*.  I grant Westin's motion as to Counts I and II.

## B. Count VI

The allegations of the amended complaint directed to Westin are also insufficient to state a claim for tortious interference with contract.  As defendant Westin correctly argues, to state a claim adequately, plaintiffs must allege not only that Westin interfered with an existing contract, but that she committed some impropriety in doing so.  *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill.2d 460, 485, 693 N.E. 358 (1998).  I find that plaintiffs' allegations fail to meet this requirement.

Plaintiffs' allegations can reasonably read to allege two types of wrongful conduct on Westin's part.  The first relates to the antitrust allegations directed to Westin.  Because those claims fail to plead that Westin participated in an anticompetitive scheme, they also do not support an inference of impropriety.  Plaintiffs also allege that Westin made "false and derogatory statements" about Hackman.  Although a reasonable interpretation of these allegations is that they support a defamation claim, plaintiffs notably do not include Westin in Count V for defamation.  The remainder of plaintiffs' allegations of wrongful conduct by Westin, such as the attribution of an improper motive for her statements to Hackman's agent, are simply too speculative and conclusory to support their claim.

For the foregoing reasons, I grant Westin's motion as to Count VI.

VII.

For the reasons discussed above, I deny defendant Prudential and defendant Licary's joint motion to dismiss Counts I and II. I grant Defendants RAAR and IAR's joint motion to dismiss Counts I-IV, and VI. I grant Defendant Hall's motion to dismiss Counts I, II and VI. I grant Defendant Sheley's motion to dismiss as to Counts I, II and VI, but I deny the motion as to Count V. I grant Defendant Westin's motion to dismiss as to Counts I, II and VI.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

**Dated:** May 28, 2008