# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **GREGORY HACKMAN d/b/a GREGORY HACKMAN RELATORS,** and **GREGORY HACKMAN REALTORS, INC.**, an Illinois corporation<br><br>Plaintiffs,<br><br>v.<br><br>**DICKERSON REALTORS, INC.**, an Illinois corporation **d/b/a DICKERSON-NEIMAN REALTORS, WHITEHEAD, INC.**, an Illinois corporation **d/b/a WHITEHEAD REALTORS, R. CROSBY, INCORPORATED,** an Illinois corporation **d/b/a PRUDENTIAL CROSBY REALTORS, McKISKI-LEWIS, INC.**, an Illinois corporation **d/b/a TOM McKISKI REALTORS, LORI REAVIS, RAY YOUNG, MICHAEL DUNN, MELISSA SMITH, JESSICA LICARY, DIANE PARVIN, FRANK WEHRSTEIN, FRANK SHELEY, MARY WESTIN, LARRY PETRY, ROCKFORD AREA ASSOCIATION OF REALTORS, TERRI HALL,** and **ILLINOIS ASSOCIATION OF REALTORS,**<br><br>Defendants. | No. 06 C 50240 |

## MEMORANDUM OPINION AND ORDER

Currently pending in this now familiar case are the summary judgment motions of the only remaining defendants: Dickerson Realtors, Michael Dunn, Frank Wehrstein, Lori Reavis, and Frank Sheley, five real estate brokers or agents alleged to have engaged in an anti-competitive scheme to drive plaintiffs out of the Rockford, Illinois real estate market. I have issued three previous opinions in this case, all prior to discovery, paring down the

parties and the scope of the claims.  *See Hackman v. Dickerson Realtors, Inc.*, 520 F. Supp. 2d 954 (N.D. Ill. 2007) ("*Hackman I*"); *Hackman v. Dickerson Realtors, Inc.*, 557 F. Supp. 2d 938 (N.D. Ill. 2008) ("*Hackman II*"); and *Hackman v. Dickerson Realtors, Inc.*, 595 F. Supp. 2d 875 (N.D. Ill. 2009) ("*Hackman III*") (all granting various motions to dismiss in whole or in part).[1]  The present motions contend that the evidence revealed during discovery is insufficient to raise any triable issue with respect to plaintiffs' claims that the remaining defendants violated the Sherman Act and the Illinois State Antitrust Act (counts I and II); that they defamed plaintiffs (count V); or that they committed tortious interference with plaintiffs' business expectancy and contract (count VI).  Because I agree with defendants that they are entitled to judgment on these claims, this unusually drawn out case has now reached its denouement.

Plaintiffs (sometimes referred to collectively as "Hackman") assert that defendants engaged in concerted, anticompetitive behavior beginning sometime in 1999 and continuing through the filing of Hackman's second amended complaint on September 25, 2008.  Hackman's premise is that defendants were disgruntled over advertisements plaintiffs began running in 1999, which offered to charge commission rates in the five percent range to prospective sellers, since the advertised rates were lower than the "going

---

[1] In addition, several defendants have been dismissed from the case pursuant to settlement.

rates" charged by defendants of six or seven percent.  Hackman claims that in 1999, defendants formed an illegal agreement to punish Hackman for offering these lower commission rates and undertook joint efforts to put Hackman out of business.  These efforts included: threats by defendant Dickerson to pay a one percent commission "split" to Hackman in any transaction in which Hackman represented the buyer of a Dickerson-listed property, regardless of the "split" advertised for that property;[2] "boycotting" Hackman generally, including denying Hackman's agents access to Dickerson-listed properties from March 5-8, 2004; filing, or threatening to file, frivolous ethics complaints against Hackman before the Rockford Area Association of Realtors; and making false, disparaging remarks to Hackman's clients or potential clients.

I.

Summary judgment should be granted "if there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." *Chaklos v. Stevens*, 560 F.3d 705, 710 (7th Cir. 2009) (quoting Fed. R. Civ. P. 56(c)).  Under Rule 56(c), the moving party bears the initial burden of pointing to the portions of the record that demonstrate an absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant carries this burden, the non-movant must then

---

[2]As I have explained previously, the "split" is the percentage of the sale price paid to the agent representing the buyer. *Hackman II*, 557 F. Supp. 2d. at 946.

3

identify specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. at 586. One commonsense formulation of the ultimate question on summary judgment is this: "[i]f a sensible jury could find in favor of the party opposing the motion, then summary judgment must be denied." *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 896 (7th Cir. 2001). Only evidence that would be admissible at trial may be considered. *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 533 (7th Cir. 2003).

A. Antitrust Claims (Counts I and II)

Hackman's antitrust claims assert violations of Sections 1 and 2 of the Sherman Act and the corresponding sections of the Illinois Antitrust Act.[3] Before proceeding to Hackman's Section 1 claim, which requires a more nuanced analysis, I pause briefly to dispose definitively of plaintiffs' Section 2 claim. Although this claim narrowly squeaked by dismissal on two previous occasions (in both *Hackman II* and Hackman *III*, I observed that construing the complaint

---

[3]As I noted in *Hackman III*, one of asserted provisions of the state statute does not have a direct counterpart in the Sherman Act. 595 F. Supp. 2d at 881. At this juncture, however, both parties assume that plaintiffs' state law antitrust claims rise and fall with their federal claims, and plaintiffs raise no argument that any portion of their state claims should survive independently of their federal claims. Accordingly, my discussion of the federal statute disposes of all of Hackman's antitrust claims.

4

to state a Section 2 claim at all was "based on a particularly generous reading of plaintiffs' allegations," 595 F. Supp. 2d at 897), there is no question that Hackman has failed to identify sufficient evidence to withstand summary judgment. Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize" interstate commerce. 15 U.S.C. § 2. None of the iterations of plaintiffs' complaint makes clear which of the several acts prohibited by Section 2 is alleged. Nevertheless, I previously construed Hackman's claim to assert a conspiracy to monopolize, and explained that this claim required proof of "1) the existence of a combination or conspiracy, 2) overt acts in furtherance of the conspiracy, 3) an effect upon a substantial amount of interstate commerce and 4) the existence of specific intent to monopolize." *Hackman I*, 520 F. Supp. 2d at 964 (quoting *Great Escape, Inc. v. Union City Body Co., Inc.*, 791 F.2d 532, 540-41 (7th Cir. 1986)) There is no question that the record is barren of any evidence of the third or fourth of these elements.

But it now appears from plaintiffs' undeveloped citation to *Endsley v. City of Chicago*, 230 F.3d 276 (7th Cir. 2000),[4] that they

---

[4]Plaintiffs articulate no argument based on *Endsley*, but they cite the case for its statement of this standard: "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." 230 F.3d at 283. The claim

seek to proceed not on a conspiracy-to-monopolize theory, but instead on the theory that one or more defendants individually possessed unlawful monopoly power. Construed in this fashion, however, there is no shortage of bases on which to reject plaintiffs' claim. In fact, such a claim undoubtedly would not have survived a motion to dismiss, since Hackman alleged only that defendants' *collective* market share afforded them monopoly power, not that any *individual* defendant possessed such power. Hackman did allege that defendant Dickerson listed "approximately fifty percent of the properties on the market at any one time." But market share alone is "an insufficient indicator of a company's capacity to control prices and exclude competitors," *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 271 (7th Cir. 1981), and in any event, this statistic makes no reappearance in plaintiffs' Rule 56.1 statements or supporting evidence. Moreover, Hackman offers no response to Dickerson's observation that Hackman's own market share was so minimal that even Dickerson's unlawful acquisition of that share (and there is no claim that Dickerson sought to swallow up any other competitors) would have no meaningful effect on competition, and therefore would not violate § 2 of the statute. For at least these reasons, plaintiffs have raised no genuine issue on their theory of unlawful monopoly, and defendants are entitled to judgment on counts

---

in Endsley was that the defendant, the City of Chicago, "possessed monopoly power" in violation of Section 2.

I and II to the extent they assert claims under Section 2 of the Sherman Act and corresponding provisions of the Illinois Antitrust Act.

Proceeding to Hackman's Section 1 claim, I have previously noted that a successful claim under this provision "requires proof of three elements: (1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury." *Hackman II*, 595 F. Supp. 2d at 878 (internal quotations and citations omitted). The precise contours of Hackman's Section 1 claim are not clear. While defendants characterize the claim as a "conspiracy to boycott," and indeed, plaintiffs have at times used these terms to describe the alleged conspiracy, Hackman insists that the conspiracy was broader than merely an agreement to boycott Hackman. Hackman argues that defendants' agreement was to "ruin" Hackman, and that the illegal boycott--though itself a *per se* violation of the statute--was only one of several means to this end.

Whether the alleged boycott is the alpha and omega of plaintiffs' claim, or merely one act among others in a broader anticompetitive scheme, the "group boycott" is clearly central to Hackman's theory of liability. It is problematic, then, that the undisputed facts reveal sales by Hackman of properties listed by defendant Dickerson in *every year* of the alleged boycott, as well as sales by defendants of Hackman-listed properties in every year

7

through 2006. Indeed, Hackman acknowledges that Dickerson sold 5% of Hackman's total listings in 2004, 7% of Hackman's total listings in 2005, and 9% of Hackman's total listings in 2006. These statistics are flatly inconsistent with plaintiffs' claim that defendants refused to deal with them during this period. Unable to dispute these figures, Hackman lamely speculates that a single, rogue Dickerson agent "did not get or listen to the policy" of refusing to deal with Hackman. Notably, however, Hackman points to nothing in the record to support this interpretation. No sensible jury could conclude that defendants engaged in a "group boycott" spanning the 1999-2008 period.

But Hackman also alleges a specific "boycott" from March 5-8, 2004. While it is undisputed that Hackman's agents were unable to show any properties listed by Dickerson during that time, defendants offer evidence that defendant Dunn--pursuant to whose orders Hackman was excluded from Dickerson's listings--acted independently in Dickerson's own interest.[5] Accordingly, to fend off summary judgment, plaintiffs must counter with evidence "'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

---

[5] I note in passing that although neither party addresses the issue, I assume that there can be no conspiracy between Dickerson and its own agents, since under agency principles, the agent and the principal are treated as one entity, not as two entities acting in concert. Any conspiracy presumably has to be among either Dickerson's agents acting in concert with each other but outside the scope of their agency with Dickerson, or among Dickerson or its agents and other entities or their agents.

8

*Corp.*, 475 U.S. 574, 588 (1986). But plaintiffs identify no evidence to suggest that any alleged co-conspirator was even aware that Dickerson had excluded Hackman from its properties, much less that they jointly agreed to exclude Hackman. The undisputed evidence is that defendant Dunn directed the local Dickerson offices not to set up appointments with Hackman over those days, and that at some point, defendant Wehrstein became aware of the directive and put an end to it. There is not even a hint of evidence that Dunn discussed the directive with any defendant other than Wehrstein, who evidently did *not* agree with it.

So there was no group boycott, either general or specific. If this conclusion is not the nail in the coffin of plaintiffs' conspiracy claim, there are plenty of others. Hackman's only direct evidence of an agreement among defendants is Gregory Hackman's testimony that defendant Wehrstein told him, in the company of other local realtors at a RAAR event in 1999, "[l]ook, we have been talking, and you're going to stop taking listings at 5%...[otherwise] we're going to boycott you," and that five years later, Wehrstein told him, "[w]e're going to put the full court press on now...I'm going to have you expelled from the Rockford Area Association of Realtors, we're going to have you expelled." Yet, as discussed above, no boycott ever materialized, and Hackman does not identify a single anticompetitive act allegedly taken by Wehrstein or any other defendant between 1999 and 2004. Indeed, Hackman admits that his business flourished during this period, when

9

even his transactions with the alleged co-conspirators increased. Whatever Wehrstein might have meant by the statement he allegedly made in 2004, Hackman points to no evidence that Wehrstein or any other co-conspirator took any action in furtherance of any agreement to have Hackman "expelled" from RAAR.[6]

On Hackman's history of consummated transactions with defendants, Hackman appears to be of two minds. Hackman first insists that "the numbers speak for themselves," but then accuses defendants, in the very next breath, of "spinning the numbers" to obscure their unlawful conduct. In particular, Hackman points to a drop-off in business between Hackman and Dickerson after 2006 as proof that "once Hackman started getting too successful," defendants' illegal efforts began "in earnest." But this argument deserves no serious consideration. No sensible jury could believe, based on these statistics, that a boycott that allegedly began in 1999, then lay entirely dormant until 2004 (the year in which essentially all of the acts claimed to be in furtherance of the conspiracy occurred, but in which Hackman's business with defendants nevertheless reached its peak), somehow caused plaintiffs' business to plummet only in 2007, despite the conspiracy's apparent return to dormancy for all of 2005 and 2006. In addition, the evidence on which Hackman relies to implicate defendants Dunn and Reavis in

---

[6]Hackman's suggestion that the ethics complaint filed by Reavis was an effort of this sort is not supported by the evidence, as discussed further below.

10

the putative conspiracy is plainly insufficient to withstand summary judgment. As evidence of defendant Dunn's participation in the alleged scheme, Hackman cites (in addition to his role in the "boycott" of March 5-8, 2004, discussed above), Dunn's drafting of the so-called "one percent letter," and Dunn's alleged threat--which Hackman admits was never carried out--to file an ethics complaint against Hackman if he did not raise his commission rates. But like the events of March 5-8, 2004, the one-percent letter appears to have been an independent act taken on Dickerson's behalf, in furtherance of Dickerson's individual interests, and without the knowledge of any other co-conspirator. Moreover, as I have noted previously, the governing professional rules appear not only to allow but indeed to require that such a letter be sent under the circumstances alleged here, undercutting any plausible inference that the letter was sent pursuant to an anticompetitive agreement. In any event, Hackman admits that the letter was never "enforced," i.e., Hackman agents all ultimately received the advertised "split" on the sale of Dickerson listings.[7] Dunn's alleged threat to file frivolous ethics complaints likewise rings hollow, since Dunn had

---

[7]I pause to note that Hackman's repeated insistence that the one-percent letter was enforced in a particular transaction, despite his acknowledgment that although Hackman received one percent of the total commission upon the closing of that deal, it received the remainder of the advertised "split" several days later, is disingenuous. Such efforts to obscure the undisputed factual record--and there are other examples in plaintiffs' submissions--are not well-taken.

only a minor role in the only ethics complaint actually filed (by Reavis), and the decision in that proceeding belies the claim that it was "frivolous."

With respect to Reavis, Hackman relies on the ethics complaint and on evidence that Reavis discussed entering into a listing agreement with a client of Hackman's as evidence of her agreement in the alleged conspiracy. But these facts cannot support the weight of the inference with which Hackman freight them. Hackman acknowledges that the transaction giving rise to Reavis's ethics complaint was fraught with antagonism on both sides, and the evidence is that her complaint against Hackman was in good faith, and, indeed, at least partially meritorious. And Hackman offers nothing to counter evidence that Reavis's contact with Hackman's client was motivated by her own professional interests.

In short, there was no boycott, there was no anticompetitive agreement involving Dunn or Reavis, and any agreement Wehrstein may have made was without consequence, as he took no acts to further the scheme to which Hackman claims he admitted,[8] and Hackman appears to have suffered no cognizable injury in any event.[9] There is simply

---

[8]Wehrstein's putative role in the one-percent letter and in Reavis's ethics complaint cannot plausibly be considered acts in furtherance of the agreement to which Hackman claims Wehrstein admitted for many of the same reasons the evidence of Dunn's and Reavis's roles does not support the inference of an agreement.

[9]In light of the multiple insufficiencies of Hackman's claim, I need not examine further Hackman's evidence and argument relating to the damages issue.

nothing left of plaintiffs' antitrust claims. Defendants are entitled to summary judgment on counts I and II.[10]

### B. Defamation Claim (Count V)

Hackman's defamation claim is pending only against defendants Dickerson, Sheley and Reavis. Little analysis is required to conclude that these defendants are entitled to summary judgment on this claim as well. To state a claim for defamation under Illinois law, "a plaintiff must show that the defendant made a false statement about the plaintiff, there was an unprivileged publication to a third party by the defendant, and the publication damaged the plaintiff." *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 698 (7th Cir. 2006). Hackman makes no serious attempt to establish these elements. Plaintiffs rely upon exactly three pieces of evidence in support of their claims. First, as to defendants Sheley and Dickerson, Hackman cites the testimony of a former Hackman agent, Christopher Artz, who testified that in the course of a transaction between Sheley's sellers and Hackman's buyers, Sheley told him Artz that he (Sheley) had, at some unspecified earlier time, told his (Sheley's) clients not to accept Hackman's clients' offer because Hackman's deals "never close." It is unnecessary to delve into whether the alleged statement is the kind of "false statement" that can support a defamation claim because Hackman presents no competent

---

[10]Plaintiffs' antitrust claims against Dickerson--an entity that only acts through its agents--cannot survive the dismissal of these claims against the agents.

13

evidence of the statement at all. Artz has no direct knowledge of Sheley's statement, and his testimony is insufficient to raise a genuine issue of material fact. Moreover, the deal in question *did* close, so Hackman's claim for damages based on the alleged statement is perplexing.

Also in putative support of Hackman's defamation claim against Dickerson, Hackman cites a statement imputed to a Dickerson agent not a party to this suit[11] that Gregory Hackman is a "cokehead," and that she had "seen him with white powder running out of his nose." Plaintiffs' evidence of this statement is the affidavit of one of Hackman's clients, who testified that the Dickerson agent made this statement to him at a party. The affiant further testifies, however, that he "did not particularly believe the statements," so again it is difficult to understand what damages Hackman may have suffered. Moreover, Hackman seeks to hold Dickerson liable for the statement on a theory of agency, but he offers neither evidence nor argument to support this theory of liability, which is not self-evident based on the context in which the statement was allegedly made.

Finally, Hackman claims that Reavis's filing of a "frivolous" ethics complaint constitutes defamation. As previously discussed,

---

[11]For the sake of accuracy, I note that plaintiffs sought to amend their complaint to add this individual as a defendant, but I denied the request on the ground that by the time of plaintiffs' motion, the litigation had proceeded too far to add another defendant.

14

the evidence is that the complaint was brought in good faith and was not frivolous. Moreover, Hackman's opposition brief does not identify a single specific statement in the ethics complaint that Hackman claims is untrue. The opaque references to evidence that Hackman agent Jeff DeWitt's had a "dual agency disclosure" and that "the Marquezes" were DeWitt's clients are plainly insufficient in this regard. For at least these reasons, Hackman's defamation claim against Reavis does not withstand summary judgment.

Defendants Dickerson, Sheley and Reavis are entitled to summary judgment on count V.

## C. Tortious Interference

As I have previously held, "a claim for tortious interference with prospective economic advantage requires that plaintiffs show (1) their reasonable expectation of entering into a valid business relationship; (2) defendants' knowledge of that expectancy; (3) purposeful interference by the defendants preventing that expectancy from being fulfilled; and (4) damages resulting from such interference." *Hackman* II, 557 F. Supp. 2d at 948 (citing *Hackman I*, 520 F. Supp. 2d at 970-71 (citing *Burrell v. City of Mattoon*, 378 F.3d 642, 652 (7th Cir. 2004))). Hackman argues, in a cursory fashion, that the one-percent letter (and "policy"--though it is undisputed that no such policy was ever implemented), and the events of March 5-8, 2004, are sufficient to entitle plaintiffs to a jury on their claim of tortious interference by Dickerson, Dunn, and

Wehrstein. But no sensible jury could conclude that Hackman's evidence is sufficient to entitle plaintiffs to judgment on these claims.

Hackman's current theory of liability based on the one-percent letter does not withstand analysis. Plaintiffs' original theory, advanced at the motion to dismiss stage, was that the one-percent letter interfered with Hackman's business expectations vis-à-vis Hackman's *agents*, who Hackman claimed defected once they learned that they stood to earn only a one-percent commission in any transaction with Dickerson. But the evidence revealed during discovery cut this theory off at the knees, since both agents alleged to have abandoned Hackman's employ for this reason testified that their departure was not prompted by the one-percent letter. Rather than drop the argument that the one-percent letter supports this claim, Hackman now offers the convoluted theory that the one-percent letter caused Hackman's agents to lose their "motivation" (or somehow their "ability") to show Dickerson properties, which impaired Hackman's clients' ability to see the properties they wanted to see, which ultimately caused the clients to stop working with Hackman. Even if plaintiffs could find support in the law for such a tangled theory (for which they cite no authority), a more fundamental flaw plagues their claim: to support a tortious interference claim, defendants' actions would have to have been directed *toward the third parties* with whom Hackman claims a

16

business expectancy. *Du Page Aviation Corp. v. Du Page Airport Authority*, 594 N.S. 3d 1334, 1341 (Ill. App. Ct. 1992). Actions directed towards plaintiffs, even if they allegedly "interfered with plaintiffs' ability to continue dealing with their own customers" cannot support a claim for tortious interference. *Id*. The one-percent letter was plainly directed to Hackman, not to any third parties.

The events of March 5-8, 2004 cannot support plaintiffs' claim for similar reasons. As noted previously, plaintiffs offers no competent evidence that they lost any clients as a result of the events of March 5-8, 2004. And the actions Hackman impute to defendants were directed toward plaintiffs, not toward any specific third parties.

For the foregoing reasons, defendants Dickerson, Dunn, and Wehrstein are entitled to summary judgment on this claim.

Defendant Reavis is also entitled to summary judgment but for different reasons. Hackman argues that Reavis's conduct toward "the Reimers"--clients of Hackman's who became clients of Reavis's after the expiration of their agreement with Hackman--unlawfully interfered with Hackman's reasonable business expectancy with them. But "[c]ompetition is one of the numerous privileges that serve as a complete defense to a claim for tortious interference." *BlueStar Management v. The Annex Club*, LLC, No. 09 C 4540. 2010 WL 2802213 at *8 (N.D. Ill. July 12, 2010) (Gettleman, J.) "In Illinois, the

competition defense is recognized so long as competitive conduct is not motivated solely by spite or ill will." *Id*. (Citing *International Mktg., Ltd. v. Archer-Daniels-Midland Co., Inc.*, 192 F.3d 724, 731 (7th Cir. 1999). The undisputed fact that Reavis signed her own contract with the Reimers after their contract with Hackman expired refutes any claim that Reavis's conduct towards the Reimers while they were Hackman's clients was motivated "solely" by spite or ill will. Plainly, Reavis sought to add the Reimers to her own client roster, not maliciously to disrupt Hackman's client relationship with them. Hackman offers neither evidence nor argument to the contrary.

### III.

For the foregoing reasons, the summary judgment motions of defendants Dickerson, Dunn, Wehrstein, Reavis and Sheley are granted in their entirety.

                           **ENTER ORDER:**

                           _____

                           **Elaine E. Bucklo**

                           United States District Judge

**Dated:** October 22, 2010